484

**In the Matter of TOWNSEND GROWTH FUND, INC., Debtor.**

United States District Court
S. D. New York.
Aug. 25, 1965.

Leslie Kirsch, New York City, trustee.

Kaye, Scholer, Fierman, Hays & Handler, New York City, for trustee; Milton Kunen, Ivan Serchuk, Daniel Halperin, and Joseph J. Moscou, New York City, of counsel.

Richard V. Bandler and Ira N. Smith, New York City, for Securities and Exchange Commission.

Sherman & Goldring, New York City, for debtor; Irving Michael Atkin and Bernard Kahn, New York City, of counsel.

Feldman, Kramer, Bam & Nessen, New York City, for T. W. Phillips Gas & Oil Co. and Pennsylvania Investment & Real Estate Corp.; Foster Bam, New York City, of counsel.

Francis N. Littlejohn, Jr., pro se.

THOMAS F. MURPHY, District Judge.

These are applications for allowances in a Chapter X proceeding that has been unusually successful. The matter of allowances was the subject of a prior memorandum of the court, dated October 29, 1964. Certain interim dispositions were made therein and the matter was continued because:

"* * * The unanimously expressed gratification with the unusual success in administration of the estate seemed marred only by the necessity of paying the cost of its accomplishment. That thankless task and disagreeable duty must be discharged by the court without 'vicarious generosity.' * * *

"* * * The questions of fact involved in these allowances are among the most important matters which have come before the court for determination in these proceedings. They have been presented on petitions and argument without the safeguards of examination and cross-examination in open court.

"Accordingly, to avoid determination of these important matters upon 'casual conjectures' by anyone and in fairness to all concerned we have decided to take proof of the facts and to conduct further hearings. * * * It is also desirable to bring these proceedings closer to substantial consummation of the Plan of Reorganization before the greater part of the cost of it all is paid out. The success is here but the action of making it more concrete to the shareholders of the Fund in the form of checks representing the return to them of most of their investment remains to be taken."

Since then, proofs of the facts have been taken, and a cash distribution has been made of $1,585,972.50, at the rate of $5.25 per share, to the holders of stock in the Fund.

The amounts of compensation requested by the trustee, his counsel and Mr. Littlejohn are substantially higher than the amounts which have been recommended to the court by or in behalf of the Securities and Exchange Commission (the "Commission"). Specific findings of fact are required.

### FINDINGS OF FACT

#### – A –

#### *THE ESTATE AT INCEPTION.*

1. On May 10, 1961, Townsend Growth Fund, Inc. (the "Fund" or the "Debtor"), formerly known as Townsend U. S. & International Growth Fund, Inc., a corporation organized under the laws of the State of Maryland, filed in this

court a voluntary petition for reorganization under Chapter X of the Bankruptcy Act. On that day, the petition was approved and the court appointed Leslie Kirsch as trustee (the "trustee") of the Debtor. The affairs of the Debtor have been administered by the trustee from May 10, 1961 to date.

2. This is the first administration in Chapter X proceedings of a mutual fund.

3. On May 10, 1961, there were outstanding 302,090 shares of stock in the Fund, owned in approximately 1,900 accounts by persons (the "shareholders") located throughout the United States and, in part, in certain countries of North and South America, Europe, Asia and Africa. No committees were formed. The trustee has represented the interests of all the shareholders from May 10, 1961, to date. The trustee also acted as such in relation to all creditors of the Fund.

4. The Fund was an open-end, nondiversified, registered investment company subject to the provisions of the Investment Company Act of 1940. Its prospectus had declared a policy of investments in "special situations" and taking "calculated risks." Those in control of the Fund pursued such policy with improvidence. They violated provisions of the Investment Company Act.

5. On May 10, 1961, when the trustee took possession of the Fund and its properties, it had "investments at cost" of $2,129,375. It had only $62,534 in cash. Its total assets, including the "investments at cost," were stated at $2,228,700. Its liabilities to creditors were stated at $338,108, including its past due bank loan of $300,000. Its total capital and surplus, including "investments at cost," were stated at $1,890,592.

6. Approximately $1,560,000 or 65.3% of all such "investments at cost" were stated by the Debtor in its petition for reorganization to be "frozen." The realizable value of the capital and surplus of the Fund on May 10, 1961, was substantially less than $1,890,592.

7. The Fund, as is customary in the mutual fund business, was obligated to redeem its shares of stock for cash at any time upon request of any shareholder.

8. From September 1, 1960 to May 3, 1961, the Fund was drained of a large part of its capital by paying out $1,762,227 in cash for redemptions of 272,224 shares of its own stock. Amounts paid on such redemptions were fixed, without independent valuations, on the basis of "investments at cost" in several large investments that could not be sold at such cost.

9. On or about August 31, 1960, the registration statement of the Fund under the Securities Act of 1933 ceased to be effective, and thereafter it sold no more of its capital stock. It failed to offset the depletion of its capital resulting from the redemptions from September 1, 1960 to May 3, 1961. During that period it sold liquid security investments to satisfy the demands for redemption. On May 10, 1961, the court enjoined further redemptions. The injunction remained in effect until January 11, 1965.

10. The remains of the Fund on May 10, 1961, were in the ostensible form of 319,512 shares of stock, and $547,333 face amount of unsecured notes, in 30 corporations. In reality they were, to the extent of 65% of all such remains at cost, the "special situations" or "calculated risks" referred to above.

11. Among them was the Fund's stock and notes in Office Buildings Corporation of America ("OBCA"), representing a 60% equity interest in the leasehold of an office building in Tulsa, Oklahoma.

12. Early in the proceeding, the court appointed an expert appraiser to determine the value of such equity. Upon the basis of his appraisal, its value was $153,000 as of September 15, 1961. The Fund had paid $444,000 for it, and included it at that amount in "investments at cost" in its balance sheet of May 10, 1961.

13. On May 10, 1961, the Fund's investment in OBCA did not have a realizable value of $444,000, but at least $291,000 less than that.

14. Another of the Fund's "special situations" or "calculated risks" was its investment in 100% of the stock of Kite Broadcasting Company ("KITE"), which owned a radio broadcasting station in San Antonio and adjacent Terrell Hills, Texas.

15. Early in the proceeding, the court appointed an expert appraiser to determine the value of the investment in KITE. The appraisal was of two dates. As of December 31, 1959, the date practically proximate to the acquisition date of February 24, 1960, the appraised value was $256,098 on terms of installment payments. The Fund had paid $458,331 on terms.

16. As at August 31, 1961, the appraised value of KITE was $339,822, subject to the following qualifications and terms: (i) installment payments of the purchase price with 29% paid in cash, and the balance payable with interest of 5–5½% in equal installments over five years; (ii) 20% less for complete payment in cash; (iii) 20% more if installment payments were extended over ten years.

17. On May 10, 1961, the Fund's investment in KITE did not have a realizable value of $458,331, the amount included in "investments at cost," but on a cash basis at least $186,473 less than that.

18. Another "calculated risk" was the Fund's exchange transaction with Great American Industries, Inc. ("GAI"). The Fund exchanged 85,179 shares of its stock redeemable in cash for 222,222 shares of the nonredeemable stock of GAI. The exchange was made in violation of the Investment Company Act. The Fund was mulcted of $534,224 cash when GAI induced the Fund to redeem the stock GAI had gotten in such exchange. On May 10, 1961, the Fund had left 121,822 shares of the GAI stock. It was included in the Fund's balance sheet in "investments at cost" at $274,099.50, or $2.25 per share.

19. The GAI stock was listed on the American Stock Exchange. But the trustee could not sell GAI stock in May 1961. He held the GAI stock for rescission by suit of the entire illegal exchange transaction.

20. The stock of GAI had the Standard & Poor's rating of "C", meaning "Lowest." On an earnings basis, the GAI stock on May 10, 1961, had a value of about 60¢ per share, but, held as it was for rescission, it was not practicable to ascribe to it any amount of realizable value on that day. Its realizable value was to be created in the ensuing Chapter X proceedings.

21. Another of the Fund's "calculated risks" was its investment in June 1959 in Taurcanis Mines, Ltd. ("TAURCANIS"). The Fund paid $30,197.51 for it, or $30.20 per share. Since March 1958 TAURCANIS stock had been on the Canadian "Restricted List" of the Commission. It could not be lawfully bought or sold through a broker in the United States. No "quote" for it could be procured even in Canada. As of February 28, 1962, TAURCANIS had current assets of $5,924 and current liabilities of $1,282; the rest of its assets consisted of capitalized mining claims, exploration expenditures and miscellaneous items. On May 10, 1961, the Fund's TAURCANIS stock had no realizable value. Its realizable value was to be created in the ensuing Chapter X proceedings.

22. On May 10, 1961, the Fund held 38,125 shares, or a minority interest of 8%, of the stock of Modern Engraving and Machine Company ("MEMCO"). It was included in "investments at cost" at $66,521.25, or $1.74 per share. It had no market. The rest or 92% of the MEMCO stock was owned by Townsend Corporation of America ("TCA"). On May 10, 1961, the Fund's investment in MEMCO had no realizable value. Its realizable value was to be created in the ensuing Chapter X proceedings.

23. The Fund held $100,000 face amount of debentures of TCA, included in "investments at cost" in that amount. TCA was involved in an equity receiver-

ship in New Jersey, wherein payment of the debentures was enjoined. They later went into default. There was no market for them. Their realizable value on May 10, 1961, was speculative.

24. The Fund held 2,500 shares of stock of Pan American Fund, Inc. ("PAN"), included in "investments at cost" at $25,000. There was no market for it. PAN was a small company whose investments were in Latin America, beset with problems of expropriation, inflation, exchange obstacles, and general decline in value. On May 10, 1961, the realizable value of its stock was speculative.

25. The Fund held 44,300 shares of the stock of Academy Life Insurance Company ("ACADEMY"), included in "investments at cost" at $111,905, or $2.52 per share. ACADEMY was a recently organized company selling life insurance to war veterans by mail. Of the lot, 4,300 shares were free of sale restriction, but 40,000 shares were restricted from sale by an investment letter. After the trustee sold 2,100 of the free shares, there was no market for the rest. As at August 31, 1961, the book value of ACADEMY stock was $1.08 per share. The realizable value of the 40,000 restricted and 2,200 unrestricted shares of ACADEMY on May 10, 1961, was speculative.

26. The smaller the cost of a stock the larger is the percentage of its price fluctuation up or down.

27. The Fund held certain large blocks of listed shares subject to that kind of fluctuation: e. g., the 121,822 shares of GAI stock at a cost of $2.25 per share; 38,000 shares of National Bellas Hess, Inc. ("HESS"), at an average cost of $7.81 per share. Blockage discount from quotations for small or normal lots was not taken for such stocks.

28. The stock of HESS had the Standard & Poor's rating of "B", meaning "Below Average." For the year 1960, it earned 46¢ per share.

29. From May to September 1961, there were wide fluctuations in the prices of HESS stock. Market knowledge, judgment, and skill were required to trade it and other stocks to the advantage of the estate.

30. On May 3, 1961, the Fund permitted Irving Trust Company, which was also the Custodian of the Fund's securities under the Investment Company Act, to accelerate the maturity of its $300,000 bank loan, because the Fund had not maintained securities satisfactory to the bank, listed or traded on the New York or American Stock Exchange, equal in value to at least $900,000.

31. As of May 10, 1961, the cash realizable value of the Fund was within a range of about $755,225 to about $906,270, or about $2.50–$3.00 per share upon its 302,090 shares.

– B –

### THE ESTATE AFTER ADMINISTRATION.

32. As of September 30, 1964, after three and a quarter years of administration, the cash realizable value of the Fund was $2,159,325, or $7.15 per share.

– C –

### TRUSTEE'S SERVICES.

33. The trustee conducted extensive investigations of the mass of records involved in the case by personally reading, analyzing, and mastering their contents. His investigations were synthesized and recorded in his reports to the court and to the shareholders. He himself wrote all of these reports. Throughout the proceedings his reports have been the basic references for information. The trustee's mastery of the facts was the foundation of the administration and of the law suits projected or brought which resulted in substantial recoveries without trial of a single action.

34. The trustee superseded the 18 officers, directors and Advisory Board members of the Fund, and Townsend Management Company. He did not replace any of them. Throughout the proceedings, the trustee served as the sole

management and executive of the Fund in lieu of all of them.

35. The management, directors' and Advisory Board members' fees and expenses were $48,432 for the fiscal year 1959 and $54,675 for the fiscal year 1960; average $51,553.

36. Shortly after May 10, 1961, the trustee secured the resignation of Mr. Keyes as President of OBCA; caused himself to be elected President; became the sole signatory of all checks except those nominal in amount; substituted his nominee as Vice President; elected his nominees as a majority of its board of directors; transferred executive and fiscal control of OBCA from Miami to himself in New York City; and thereafter as such executive head of OBCA conducted its business from New York City.

37. OBCA's real estate business consisted of its nine story office building, with an area of 103,164 square feet of rentable space, with annual receipts of $441,030, and annual expenditures and deductions of $468,377. OBCA never paid a dividend. It failed to earn the interest on its outstanding notes. Ohio Oil Company, which occupied the entire fifth and sixth floors and penthouse space of the building at a rental of $66,780 per annum, was going to move at the imminent expiration of its lease, which represented 15% of the entire rent roll. There were repeated breakdowns of the air conditioning system. Tulsa was ceasing to be the capital of the oil industry, whose center was shifting to Houston. Large areas of rentable office space had become available in Tulsa. Rents were falling. The leases of about 40% of the rentable area of the building, made at good rates after the building had been completed in 1955, were expiring in 1961–1962. The trustee endeavored to persuade the ground lessors to permit OBCA to reorganize under Chapter X of the Bankruptcy Act without forfeiture of the ground lease under its provisions against that contingency, but the proposal was rejected. The Fund's investment in OBCA was imperilled.

38. The trustee applied his prior real estate experience to supervision and control of all income of OBCA, including negotiations for leasing vacant space and renewals of expiring leases, and of all expenditures, including those for salaries and wages, lease alterations, commissions, repairs and maintenance, insurance, accounting, air conditioning, cleaning, supplies, etc.

39. The circumstances of KITE were unsatisfactory. It had poor audience acceptance ratings. Its gross income had been inflated. Supervision was inadequate. No dividends had ever been paid. Its debt to the Fund had never been reduced. Working capital was marginal. There were heavy burdens of secured and unsecured long term debt, payable monthly. A dominating purpose of the purchase of KITE by the former management had been the disposition thereby of 99,400 of the 222,222 shares of GAI stock, in the hope of eventually eliminating the violation of the Investment Company Act committed in the acquisition of the GAI stock.

40. Shortly after May 10, 1961, the trustee visited KITE in San Antonio and Terrell Hills. He superseded the officers and directors of KITE; became its President, Treasurer and sole signatory of its checks; terminated its supervisory manager's contract; discharged the local manager and the three members of his family on the KITE payroll; transferred executive and fiscal control of KITE from San Antonio to himself in New York City; and thereafter as such executive head of KITE conducted its business from New York City. When he procured a new local manager, he acted as Chairman of the Board of Directors and Treasurer.

41. The trustee had had prior experience in the conduct from New York City of business situated in other states. His executive operations of the businesses of KITE and OBCA were conducted by long distance telephone conversations

and by a stream of air-mailed directives, discussions, records, reports, and checks.

42. The trustee made a profit of $201,200 upon the 38,000 shares of HESS stock which he sold through eight brokers over a period from May 19 to July 25, 1961, in 107 trades, at an average price of $13.1095 per share. His petition and testimony concerning the work involved in that and other trading out of large blocks of stock of inferior quality are found to be credible and are believed by the court.

43. The trustee exerted pressures upon Mr. Keyes to sell the OBCA building, but Mr. Keyes was not successful. The trustee himself tried to sell the building, but no acceptable offer was made.

44. Mr. Keyes had been a member of the Advisory Board and Mr. Rockwell had been a member of the Board of Directors of the Fund, when it bought the 60% interest in OBCA. They and their affiliates had acquired the other 40%. This was a violation of the Investment Company Act. Until the trusteeship, they had exercised practical control of the management and directorate of OBCA. The trustee and his attorney met with Mr. Rockwell's son-in-law and their New York counsel. The trustee informed them that the estate must be made whole on the OBCA transaction, and that he would sue Mr. Rockwell not only for that, but also for every loss which the estate had suffered. He estimated that the damages might range up to $1,500,000. Mr. Rockwell was reputed to have sufficient means to satisfy a judgment in such an amount. The pressures upon Messrs. Keyes and Rockwell, from loss of their practical control of the management and directorate of OBCA, mounted.

45. Mr. Rockwell's counsel stated that the Fund's investment in OBCA was not worth the $444,000 paid for it, and that his client would not pay such a sum without a general release of Mr. Rockwell from all alleged liabilities to the estate. Subsequently Mr. Rockwell's counsel made a written offer in his behalf to acquire the Fund's 60% interest in OBCA upon payment of $444,000 and the delivery of a general release of Mr. Rockwell from all his liabilities to the estate. The trustee prepared the important petition upon which the settlement was presented to the court for its approval.

46. The trustee clarified all matters of real estate title and eliminated all factual questions concerning the operations of the building during the trusteeship, upon which the effectiveness of the offer had been conditioned. After the settlement was consummated, Mr. Rockwell's attorneys bought from the trustee a copy of the appraisal which had been made by the court-appointed appraiser. No action was begun against Mr. Rockwell. The trustee had reserved his rights against all others. Later an action was begun against the other directors and others.

47. The settlement of the law suit for rescission of the GAI transaction was stimulated by the pressure of the trustee's insistence upon a motion for summary judgment. He collaborated with the attorneys in the preparation of his affidavit upon the motion. The settlement proposal followed service of the motion papers, and the motion was not determined.

48. The complicated terms of the settlement are correctly summarized at pages 19–20 of the trustee's second (§ 167) report. One of the terms which the trustee himself proposed and procured was the right to sell the GAI stock, free of the impediments of its involvement in the rescission suit, even before approval of the settlement by the court. The other terms of the settlement performable by or in behalf of GAI were merely promissory in nature. The trustee transformed the settlement into cash with boldness and celerity. He sold 44,200 shares or 36% of the entire lot before the court's order of approval was made. In 65 trades he realized $307,287, or an average price of $2.52 per share for the 121,822 shares. He made a profit of $33,179. Had he not acted as he did, the designee of GAI could, under the terms of the settlement, have made upon

the 121,822 shares, the difference between $2.375 per share (his "take" price under the terms of settlement) and the higher prices (up to $2.75 per share for 38,000 shares) at which the trustee sold. On July 9, 1964, GAI stock sold at ⅝'s or 62½ cents per share.

49. The defaulted $300,000 bank loan was equal to 14.17% of the "investments at cost" held by the Fund when these proceedings began. The trustee paid it, after building up cash, with a saving of ½% on the interest rate, from May 10, 1961 to March 5, 1962. The $7.15 per share value of the Fund as at September 30, 1964, gives effect to the payment of $300,000 with interest of 5½% upon the bank loan.

50. The trustee's services in the executive management and fiscal control of KITE cover 17 subject matter divisions of KITE's business. Such parts of his files as remain after the disposition of KITE comprise 1,644 items, exclusive of invoices and reports relating to the operating expenses of KITE. The trustee scrutinized them, and signed about 2,750 checks in payment of them.

51. The trustee formulated the procedure for the sale of KITE. He thought out unusual terms of sale and persuaded acceptance of them in his negotiations. The procedure he formulated was a conditional contract which could be made the subject of competitive bidding in open court upon terms identical to all intending purchasers, except the purchase price. Some of the unusual terms he devised were the reversals of ordinary accounting concepts and sale techniques, with such effect as considerably to increase the price and make it entirely net cash to the estate.

52. The trustee negotiated the first proposed contract for the sale of KITE with Mr. Burris as intending purchaser. At first Mr. Burris agreed to a base sale price of $350,000. KITE's business declined. In October 1961, Mr. Burris would not sign the proposed contract unless the base price was reduced to $300,000. The trustee refused. During the next year KITE improved substantially. The trustee then renegotiated the transaction with Mr. Burris, his broker, and his special counsel, and brought them up to a base price of $395,000. On October 2, 1962, a contract was signed at that base price, subject to competitive bidding.

53. The trustee prepared the important advertisement of sale of KITE, which was published in newspapers of wide circulation and in trade publications of the radio, television and related industries. On November 19, 1962, there was spirited competitive bidding before the court at the hearing for sale so advertised. The base sale price was bid up from $395,000 to $450,000.

54. The full amount realized from the sale of KITE was $465,524, all cash and without any cost for brokerage, which is usually 5% of the purchase price, payable by the seller. The reversal of brokerage was another of the unusual terms of sale made by the trustee. He continued the executive and fiscal conduct of the business of KITE until March 1, 1963, when the transaction was consummated by the transfer of title.

55. Prior to and on November 21, 1961, the trustee negotiated and accomplished the sale of the 42,200 remaining shares of stock of ACADEMY for $112,252. There was no market. His negotiations and sale of that large lot were with and to the original underwriter. The profit on the total of 44,300 shares sold was $7,542.67, of which $837.59 was made on his prior sale of 2,100 shares.

56. Prior to and on October 15, 1962, the trustee developed circumstances making possible the sale of the 1,000 shares of TAURCANIS stock. He salvaged $20 per share out of the probable total loss. He consummated the sale in Canada with the assistance of a TAURCANIS director whom he had discovered in New York City and whom he had threatened to sue here.

57. The trustee persuaded the other stockholders in PAN to liquidate rather than to commit its remaining assets to a speculative merger with a Mexican group. At the inception of liquidation of PAN in September 1962, the trustee was offered $5 per share for the 2,500 shares of PAN, but declined. He received $7.25 per share for them in the liquidation.

58. A claim for $8,969.27 was filed by Lybrand, Ross Bros. & Montgomery for accounting services undoubtedly rendered by them to the Fund under its prior management. Their bill of $1,756.31, for accounting services similarly rendered to KITE, was independent of their claim and was not involved in these proceedings. Both items were eliminated upon exchange of reciprocal covenants not to bring suits, i. e., the Lybrand firm upon these claims, the trustee upon his projected cross claims. His attorney had advised the trustee that the cross claims were dubious. The settlement developed appears to have been the price at which the Lybrand firm and the trustee would not litigate.

59. The trustee rendered services concerning (i) United States income taxes of the Fund, (ii) New Jersey, New York and Maryland corporate taxes of the Fund, (iii) New York City gross receipts and occupancy taxes of the Fund, (iv) United States income taxes of KITE, (v) Texas corporate taxes of KITE, (vi) United States income taxes of OBCA, and (vii) Florida and Oklahoma corporate taxes of OBCA. These services are reflected in 351 items of letters, memoranda, tax returns, and other documents, prepared or received and analyzed and acted upon by him, in discharge of his responsibility to pay priority charges for taxes, but lawfully to minimize them.

60. The trustee reversed the tax treatment of the $444,000 settlement with Mr. Rockwell, as first reflected on the books of the Fund by his own accountants and as presented by them to him for signature in the form of the proposed United States income tax return of the Fund for its fiscal year ended October 31, 1962. Involved was the question as to whether the $294,700 part of the Rockwell settlement and all other actual and potential recoveries from other directors and others were taxable income or non-taxable restitutions. On the first basis, taxes of about $150,000 were at stake; on the second, little or none of that amount.

61. The Fund's United States income tax return for the fiscal year ended October 31, 1962, was revised in accordance with the trustee's conceptions of the proper treatment of all recoveries by the Fund, actual and potential, as non-taxable restitutions. Its 1963 and 1964 United States income tax returns were subsequently prepared on a consistent basis to reflect recoveries in those fiscal years. The court takes judicial notice of further recoveries made in fiscal 1965 and to be reflected in the 1965 return. On August 17, 1964, the United States income tax returns of the Fund for the fiscal years 1962 and 1963 were audited by the Internal Revenue Service. The trustee's views as further developed, presented, briefed, and argued by his attorney, were accepted by the Service on audit. There was an additional assessment of $512.70, with interest, upon the return for the fiscal year 1962, and none in respect of the return for the fiscal year 1963.

62. The trustee was vigilant in review of the accounting aspects of the case. His files in connection with accountants comprise 133 items of letters prepared or received and analyzed and acted upon by him in accounting matters including accounting investigations, predecessor accountants' work products and claims for compensation; corrections of mistakes; special computations; performance of agreed schedules of accounting work within agreed limitations of fees.

63. After the settlement with Mr. Rockwell, the remaining part of the OBCA complex was Mr. Keyes' liability

for the brokerage commission he had got out of the transaction in violation of the Investment Company Act. It was calculated to have been $23,267 at par and face amount of securities in OBCA.

64. The trustee prepared an analysis of the factual and legal situation and submitted it to his attorneys, who caused a suit to be brought against Mr. Keyes in Florida. He participated in the preparation of the complaint and of answers to interrogatories on the facts, propounded by the defendant. He reviewed every other paper in the case and signed most of them.

65. He pressed for a motion for summary judgment. He made it known that he would go to Florida to prosecute the action. He and Mr. Keyes were business acquaintances who had encountered each other years before in a large transaction involving the sale of the Transportation Building, 225 Broadway, New York City, by the trustee's clients to Cuban interests represented by Mr. Keyes.

66. Mr. Keyes offered to settle by returning the OBCA stock and notes he had received or to pay $12,000 cash. The trustee procured and analyzed the financial statements of OBCA subsequent to the Rockwell settlement, recommended acceptance of the cash offer of $12,000, and the court approved. His file of the matter of Mr. Keyes' liability comprises 54 items of letters, memoranda, and other papers.

67. In performance of his duty under the provisions of 18 U.S.C.A. § 3057, the trustee conferred with United States Attorney Morgenthau and Chief Assistant United States Attorney Broderick, and made an oral presentment to them to initiate criminal prosecutions for violations of the Investment Company Act by certain directors and officers of the Fund. Mr. Morgenthau requested a memorandum recapitulating the trustee's presentment of the matter. It was submitted, and later supplemented with another.

Mr. Morgenthau's office referred the matter to the Commission. Thereafter an Assistant United States Attorney informed the trustee in writing that the accomplishment of the sale to Mr. Rockwell "would make prosecution difficult." This was before the subsequent dispositions of the GAI stock and of KITE.

68. The trustee's correspondence with shareholders comprises 1,153 letters, approximately half of them received and the other half sent by him in answer. The shareholders' letters demanded all kinds of information concerning the Fund and its affairs, including criminal prosecution and civil suits against its directors, redemption of shares, their value, use as collateral, tax treatment, sale, etc. The trustee discharged the burden of conducting such correspondence while concurrently performing his other services.

69. The trustee conducted in behalf of the Fund the presentation of his position to the Commission concerning the plan of merger of TCA and TMC. He participated actively in the hearings by cross-examination and upon briefs. He litigated with success the elimination from the plan of its ambiguous and contradictory provisions concerning payment of the Fund's $100,000 principal amount of defaulted TCA debentures, and the substitution of a definite promise to pay them on consummation of the merger. The other objective of his participation was to induce purchase by TCA of the Fund's stock in MEMCO, and settlement of the Fund's cross-claim of $63,000 against TMC.

70. His files of this one matter comprise five large folders of the transcripts, exhibits, briefs, correspondence, and other documents involved. In conferences in Washington following the hearings, the objective of complete disposition of all outstanding matters with TCA and TMC was explored, but was not attained until after they were merged as Chatham Corporation ("CHATHAM").

71. In January 1965, the $100,000 of defaulted TCA debentures were paid by CHATHAM. In July 1965, the trustee negotiated with CHATHAM's Chicago attorney sale of the MEMCO stock and settlement of the cross-claim in one transaction of dependent parts for $32,500, allocated $25,000 to the MEMCO stock and $7,500 to the cross-claim. The MEMCO stock had been unsalable for more than four years, and recoveries from other sources had substantially reduced the amount involved in the cross-claim. The transaction was approved by the court and consummated.

72. Reorganization plan alternatives and criteria for judging them were formulated, prepared, and presented by the trustee to the court and the shareholders.

73. The trustee prepared the reorganization plan. It provides for liquidation.

74. After July 10, 1964, the trustee devised and prepared all parts of the apparatus with which the reorganization plan was presented to the court and the shareholders for consideration, approval, balloting, confirmation, and consummation, and the petitions and orders pertaining thereto.

75. The trustee made 1,631 and received 543 telephone calls; made 311 trades of 281,387 shares of stock, scrutinized, sometimes corrected, and certified 38 monthly accountants' reports of the Debtor filed in court; vouched and authorized payment of every bill payable and every disbursement made by the estate; participated importantly at the hearings on every matter presented to the court; and personally conducted all details of administration not presented to the court for its approval and handled by him under the powers conferred by the order of his appointment.

76. The Debtor had to have an office, a stenographer, and the paraphernalia of operations. The trustee provided them by converting his office, his secretary, and his office facilities into those of the Debtor. This was done to the knowledge of every one participating in the case, including the attorneys for the Commission.

77. The cost allocated to the Debtor for such office rent and services was $19,665.96 for the period May 10, 1961 through December 31, 1964. Such allocation was fair in percentage and amount. No loss was thereby caused to the estate. Allocated division of such cost was a practical and economical arrangement for the estate. There was no fraud or negligence or personal profit in it by or to the trustee.

78. A normal work year comprises a five day week of about 236 actual working days, allowing for seven holidays and 14 days vacation. The trustee's working days included Saturdays, and sometimes also Sundays, without vacation. He spent 372 and a fraction working days during the calendar years 1961 and 1962, 110 working days during the calendar year 1963, and 52 working days during part of the calendar year 1964 to July 10, 1964. This aggregates 534 working days in the calendar years from May 10, 1961 to the July 10, 1964 date of his petition, or $2\frac{1}{4}$ full working years during a period of $3\frac{1}{6}$ calendar years.

79. The trustee is a brilliant lawyer with 34 years of practice in counsel, trial, and appellate work in areas of law relating to contracts, corporations, trusts, finance, banking, railways, oil companies, real estate, taxes, and large reorganizations of real estate, industrial, and utility enterprises. He, unlike most other trustees in corporate reorganizations, has no public image, nor has he ever held public office. His legal and practical business experience in these fields enabled him to perform his various services as trustee to the advantage of this estate.

80. For more than 20 years he was a very active senior member of a large and well regarded law firm; large and complex matters in the areas of law and

business mentioned above were his daily occupation; and the compensation earned therefor was at a norm substantially higher than that which he requests for his services herein.

81. The major part of what remains to be done in these proceedings to their final close will be his responsibility.

82. In connection with each and all the applications for allowances, the court takes judicial notice of the contents of the court file of these proceedings from their inception to date.

83. The court has had full opportunity to judge the veracity of the trustee, and finds him to have been credible throughout the proceedings.

– D –

*ATTORNEYS' SERVICES.*

84. On May 17, 1961, the court authorized the trustee to retain as his attorneys the firm of Kaye, Scholer, Fierman, Hays & Handler. This firm, by certain of its members and associates, has acted as attorneys for the trustee from that date to this.

85. It is a sizable law firm of 30 members, six of them managing partners, with many associate attorneys, more than 80 lawyers in all. It employs more than 100 personnel, typists, operators of duplicating machines, messengers, and others.

86. The senior participant in its services to the trustee was Milton Kunen, a managing partner of the firm. He was admitted to the Bar of this court in 1929, and is a member of the Federal Bar of New Jersey. He has acted in bankruptcy cases in Pennsylvania, Maryland and Connecticut, as well as in important bankruptcy and reorganization matters in New York and New Jersey. He is experienced in other branches of the law. He is the head of the litigation department of the firm.

87. The general division of the work was as follows: Mr. Kunen handled major aspects of the proceedings and major direct contact and discussions with the trustee and others. He was assisted by his associates, Mr. Moscou, Mr. Halperin, and Mr. Serchuk. He directed or supervised their services. Others, associates in most instances, partners in others, participated in various phases of the services.

88. During the period May 16, 1961 —August 6, 1964, the time spent was 2,678 hours, of which about 800 hours were spent by partners and about 1,850 hours were spent by associates. From August 7, 1964 to January 11, 1965, the time spent was 323 hours, in part by Mr. Kunen, and in relatively larger part by Mr. Moscou, Mr. Halperin and Mr. Serchuk.

89. Mr. Kunen conducted before Referee Herzog substantially all of the § 167 examinations of Messrs. Townsend and Davidson, President and Chairman of the Debtor, Messrs. O'Brien and Mack, President and Chairman of GAI, representatives of GAI's bank, and Mr. Leng of Lybrand, Ross Bros. & Montgomery. He also conducted at his office two informal examinations of Mr. Townsend.

90. The credit for the $444,000 settlement with Mr. Rockwell, who never appeared personally in the transaction, is divided equally between the trustee and Mr. Kunen. Their accomplishment of it, without suit, appears to have been the resultant of their complementary pressures upon and negotiations with Mr. Keyes, Mr. Rockwell's son-in-law, and Mr. Rockwell's counsel.

91. Mr. Kunen was in charge of the law suit in this court against GAI for the rescission of its exchange transaction with the Fund. He conducted the pretrial depositions of the President and Chairman of GAI, and of the representatives of its bank. He made the motion for summary judgment upon which the trustee insisted and collaborated. Thereafter he negotiated the terms of the settlement offer while the motion was held in abeyance. The large investment of the Fund in the stock of GAI was

thereby freed from involvement in the difficult rescission action. The action might have taken two years to determine. The result was uncertain. The cost would certainly have been large. The right was procured to enter a judgment against GAI after six months. It was to be for $289,327, less a credit of $2.375 per share on any stock sold by the trustee.

92. On August 27, 1962, an order was made authorizing the trustee to sue, in this and other courts, directors of the Fund. The principal action was brought in this court against the following directors as defendants: Morris M. Townsend, Clinton Davidson, Raymond E. Hartz, Albert C. Wedemeyer, Murray Shields, Charles F. Smith, Stanley M. Rowe, Sr., and James R. E. Ozias (62 Civil 2954).

93. The complaint comprises 54 pages stating 12 claims of liability for: (i) redemptions at excessive prices, including those made for "insiders,"; (ii) excessive price paid for KITE; (iii) loss on TAURCANIS stock; (iv) loss on MEMCO stock; (v) recovery of the OBCA transaction commission to Mr. Keyes; (vi–viii) expenses in connection with Board of Directors' meetings; (ix) wrongful payments to Madison Security Corporation; (x) wrongful payments to TMC as investment adviser; (xi) wrongful payments of underwriter's fees to FIF Management Corporation; and (xii) loss on stock of Dauphin Corporation. In all the claims violations were alleged of specified provisions of the Investment Company Act and rules and regulations of the Commission thereunder.

94. Defendants Davidson and Hartz appeared by Paul, Weiss, Rifkind, Wharton and Garrison; defendants Wedemeyer and Rowe by White and Case; defendant Smith by Sullivan and Cromwell; defendant Shields by Gustave Simons; and defendant Townsend appeared in person.

95. Mr. Kunen received settlement overtures from these defendants' attorneys. The negotiations to bring them up to acceptable amounts were time consuming and frequently fraught with disappointment. The ultimate results accepted by the trustee were offers totalling $78,500 as follows: Davidson, $28,125; Hartz, $16,875; Wedemeyer, $10,000; Smith, $10,000; Rowe, $10,000; Shields, $3,000; Ozias, $500.

96. The first five totalling $75,000 were negotiated by Mr. Kunen and were approved by the court on December 30, 1963; the last two for $3,500 were negotiated by Mr. Serchuk and were approved by the court on December 16, 1964. Before the settlement was made with defendant Shields, his attorney made a motion to dismiss the complaint and served a detailed demand to answer many interrogatories. The motion to dismiss was successfully opposed on argument and brief.

97. An action was brought against Mr. Keyes in Florida to recover the OBCA commission of $23,267.48 and damages for loss suffered by the Fund on its investment in OBCA (U.S.D.C., S.D.Fla., Miami Div., 582–62–M–Civil). The complaint was prepared here by Mr. Halperin under the supervision of Mr. Kunen, after the latter's selection of the Florida attorneys. There was a motion to dismiss which was denied as to the first claim and granted as to the second. Interrogatories were served and answers thereto prepared by Mr. Halperin. The case was settled without trial and $12,000 was thereby brought into the estate.

98. Two actions were begun against FIF Management Corporation ("FIF"), one in this court (63 Civil 1296), and its counterpart in Colorado (U.S.D.C., D. of Colo.No.7997), to recover advisory and underwriting fees. They both served useful purposes. The complaints were prepared in New York City by Mr. Halperin; the litigation in this jurisdiction was conducted by Mr. Kunen; the litigation in Colorado was conducted by attorneys selected by him.

99. On June 14, 1963, FIF filed an answer in the Colorado action with a counterclaim for $1,000,000 damages allegedly caused by false representations by the Fund and injury to FIF's reputation. The counterclaim was a delaying tactic, but serious because it would require extensive preparation to defend against it. Mr. Kunen handled the matter with skill. He applied for and procured in this jurisdiction a temporary restraining order against FIF's prosecution of the counterclaim in the Colorado jurisdiction, pending hearing on an injunction for such relief returnable in New York on July 10, 1963. The argument on the motion in New York between Mr. Kunen and Colorado counsel resulted in settlement by withdrawal of the $1,000,000 counterclaim and payment by FIF of $4,000.

100. An action was begun in Arizona against Charles Barrow, a former member of the Advisory Board of the Fund, and members of his family (U.S. D.C., D. of Ariz., Civil No. 4719 Phx.). The complaint was prepared in New York City by Mr. Halperin. It sought to recover, under applicable Maryland law, the excess of the amounts received by the defendants upon redemption of 59,000 shares of stock, over the amounts they should have received on proper valuation of the Fund's assets. Motions concerning the pleadings were made by both sides. The Arizona counsel selected by Mr. Kunen indicated that there would be a protracted and costly suit in that jurisdiction on valuation questions.

101. Counsel for the defendants met with Mr. Kunen and Mr. Halperin in New York City and settlement discussions were held. On March 17, 1964, the defendants submitted an offer to settle at the rate of 42.4 cents per share redeemed. The trustee accepted and, after approval by the court, the settlement was consummated and $25,016 was brought into the estate.

102. The total recoveries in all the actions brought and settled was $119,516.

103. Mr. Silverman, one of Mr. Kunen's partners in the corporate department of the firm, prepared in September and October 1961, the first form of proposed contract for the sale of KITE to Mr. Burris after it had been negotiated by the trustee. The form was followed in the contract renegotiated by the trustee with Mr. Burris a year later on better terms.

104. Mr. Connolly, another of Mr. Kunen's partners in the securities department of the firm, procured "no action" letters of the Commission releasing from the restrictions of investment letters the stocks held by the Fund in GAI, ACADEMY and PAN.

105. The attorneys procured the order for filing creditors' claims, of which nine were filed. They prepared a memorandum concerning objection or offset to the claim filed by Irving Trust Company for $300,000 and interest upon the defaulted bank loan, found none, and recommended payment. They investigated the possibility of a cross-claim to the claim filed by Lybrand, Ross Bros. & Montgomery for $8,969.27. The latter was withdrawn upon exchange of reciprocal covenants not to sue.

106. The claim filed *nunc pro tunc* by Security-Columbian Banknote Company for $1,258.44 was paid in full, but without interest pursuant to stipulation between the trustee and the Company. The amended claim of Sherman & Goldring for $1,648.53 was settled by the trustee for $1,200 in November 1964, and paid after approval by order dated December 16, 1964.

107. The small claim filed by TMC for $176.91 opened the way to the trustee's cross-claim against TMC for $63,000. Both were recently settled by the trustee; the former by withdrawal, the latter for $7,500 as found above. The attorneys contributed to this result by litigating with success the motion made in behalf of TMC to dismiss the cross-claim, on the ground that prosecution of it was barred by injunction of another jurisdiction. The attorneys also recent-

ly made a motion and filed a brief for partial summary judgment upon the cross-claim, determination of which was obviated by the settlement.

108. The legal services relating to various tax claims filed were performed by Mr. Halperin and others. These tax claims appear to have been defensive in nature, pending audit. The claim of New Jersey for $25,000 was settled for about $1,000. The claim of New York for franchise taxes in an "undetermined amount" from date of incorporation to termination of the proceedings was withdrawn and dismissed. The claim of the United States for $30,000 income taxes for three fiscal years before the trusteeship was withdrawn after audit. The amended claim of the City of New York for $4,247.51 for a period prior to trusteeship was compromised for $2,123.75. In connection with past and current New York City taxes, the attorneys furnished the trustee with a legal opinion as to their applicability to the Fund, requested a ruling, and compiled data required by the City.

109. The most substantial legal work done in tax matters related to the tax treatment of the $294,700 part of the Rockwell settlement, and to the $119,516 of subsequent recoveries from others. After the trustee's reversal of the first tax treatment of this matter, the development and conduct of it with success before the audit division of the Service, in conferences and on brief, was by Mr. Halperin.

110. Mr. Moscou was assisted by Mr. Serchuk and another in the review and tabulation of the ballots on the reorganization plan. The ballots were first received and examined for validity by the trustee who then transmitted them to Mr. Moscou for tabulation and presentation to the court.

111. Mr. Halperin handled all the legal work required to dissolve the Debtor under the laws of Maryland. It involved deviations from the norm of such procedure.

112. The trustee consulted with Mr. Halperin concerning tax questions affecting the 1964 federal income tax return of the Fund; memoranda were prepared thereon by the latter; and he reviewed the return for that year, as he had those for previous years.

113. Various associates of the firm prepared the petitions and orders concerning retention of the trustee's accountants, as from time to time extended on various terms. They duplicated, assembled, and prepared for filing in court the accountants' monthly financial reports which were certified by the trustee. They caused withdrawal of the Debtor's Blue Sky registrations in various states. Relatively few letters and calls received by them from shareholders were answered or referred to the trustee. Proofs of mailing, of service, and of some publications, were prepared by them.

114. The "Information For Voting on Trustee's Plan of Reorganization" dated August 27, 1964, the notices of "Hearing to Consider Confirmation of Trustee's Plan of Reorganization" and of "Hearing on Allowances" dated September 30, 1964, the form of ballot on the plan with instructions, the form of receipt for surrender of stock, the "Notice of Distribution" dated January 11, 1965 with the form of detachable "Letter of Transmittal" thereto annexed; and the accompanying petitions upon and with which the proceedings on the reorganization plan were advanced from formulation to consummation, were submitted by the trustee to the attorneys in printer's proofs or drafts. They reviewed them and made several recommendations.

115. Discussions between the trustee and Messrs. Kunen, Moscou, Halperin, Serchuk, and others pervade the rendition by those attorneys of their services.

116. The competences and apparatus of this large law firm were made available to and utilized by the trustee whenever required by him.

117. The firm will be responsible for whatever legal work remains to be done.

– E –

### FRANCIS N. LITTLEJOHN, JR.

118. Mr. Littlejohn was employed in New York City by the trustee to go to San Antonio to operate the radio station of KITE there and at adjacent Terrell Hills, with the title of President, upon a contract prepared by the trustee and approved by the court, providing for additional contingent compensation from the Debtor, in an amount to be fixed by the court.

119. He acted as the local operating head of KITE, subject to the direction and control of the trustee, from July 23, 1961 to March 1, 1963.

120. The fact that he was successful in the operation is conceded. So, too, is his entitlement to additional compensation.

121. His stipulated salary, subject to such contingent increase, was at the rate of $15,600 per annum. The last local president of KITE who was a resident of San Antonio had been paid $37,500 per annum.

122. As director of news and public affairs of the radio and television networks of American Broadcasting Company ("ABC"), Mr. Littlejohn's employment in New York City had been at a salary of $21,000 per annum on a permanent basis, with established fringe benefits. His home was in New York City.

123. His employment was temporary pending sale of KITE, and terminable at any time by the trustee. He was obliged to maintain two residences, his temporary one in San Antonio and his permanent one in New York City. He spent $4,897 for living quarters alone in San Antonio, while also paying the rent of his home in New York City.

124. The intent of the contingency was not to bring his salary of $15,600 per annum up to the figure of $21,000 per annum he had last earned at ABC. The intent was reward beyond his last salary, with consideration given to his going to San Antonio and the expense of maintaining a temporary as well as a permanent residence.

125. KITE was beset locally with recurrent rumors of sale. It was in fact sold on November 19, 1962, subject to approval of the Federal Communications Commission. The approval was not granted until February 20, 1963, and the sale was not consummated until February 28, 1963. During that period Mr. Littlejohn loyally stayed at his post. Had he left, the base sale price of $395,000, related as it was to the plus of earnings or the minus of loss from operations, could have been badly affected by demoralization of the station's personnel and operations.

– F –

### PRESENT STATUS.

126. As of July 31, 1965, there was in the estate $638,000 face amount of short term United States Treasury bills and $3,579.04 cash, total $641,579.04. Of that sum $96,001.50 is reserved to complete the first distribution to shareholders aggregating $1,585,972.50, at the rate of $5.25 per share. There is left the sum of approximately $545,577.54, depending upon when the treasury bills are cashed and the amount expended for insignificant current disbursements.

127. The applications as filed aggregated $356,056.25 for requested compensation, and $20,990.96 for requested reimbursement of disbursements. Thereafter the requests for reimbursement were increased by small amounts.

128. In the decision dated October 29, 1964, the court stated: "The requirement of further hearings does not prevent present determination in amounts intended to have no significance comparatively or otherwise in relation to what may be finally awarded * * * for

compensation or fees on account of the respective requests of" the applicants. On that basis, the following dispositions were made:

| | NAME | CAPACITY | INTERIM ALLOWANCE | DISBURSEMENTS |
|---|---|---|---|---|
| 1. | Leslie Kirsch | Trustee of the Debtor | $15,000 | $1,064.98 |
| 2. | Kaye, Scholer, Fierman, Hays & Handler | Attorneys for Trustee | 25,000 | 1,126.23 |
| 3. | Sherman & Goldring | Attorneys for Debtor | 2,000 | 196.01 |
| 4. | Lewis, Roca, Scoville, Beauchamp & Linton | Attorneys for Trustee in Arizona | 2,000 | 8.47 |
| 5. | Cassel & Benjamin | Attorneys for Trustee in Florida | 1,000 | 46.13 |
| 6. | Ireland, Stapleton, Pryor & Holmes | Attorneys for Trustee in Colorado | 431.25 | 67.05 |
| 7. | Benjamin & Faulkner | Attorneys for Trustee in Ohio | 500 | 5.15 |
| 8. | Leon I. Radin & Co. | Accountants for Trustee | 2,625 | – |
| 9. | Francis N. Littlejohn, Jr. | Former local manager and president of Kite Broadcasting Company | 10,000 | – |
| 10. | Hon. Asa S. Herzog | Referee in Bankruptcy | 1,000 | – |
| | | Total .............. | $59,556.25 | $2,514.02 |

Items 6, 7, 8 and 10 were in fact allowances in full of the amounts requested and require no further action.

129. The holders of 19% or more of all the outstanding shares of stock in the Fund paid $5 per share or less for their stock.

130. In the trustee's petition sworn to October 21, 1961, for approval of the Rockwell settlement, the average cost of all the outstanding shares was estimated at $6.125 per share, although for purposes of calculating the effect of the settlement the trustee used an estimated average cost of $6.50 per share. The court acted upon these estimates in approving the Rockwell settlement.

– G –

*THE COMMISSION'S RECOMMENDATIONS.*

131. The Commission made no report.

132. Though invited and urged to cross-examine the trustee and Mr. Kunen, the attorney for the Commission did not do so. The recommendations which he presented in the name of the Commission were stated to give effect to all the factors which the court should consider in fixing allowances. The persons by whom the recommendations of the Commission were formulated, and the bases thereof, were not disclosed except as follows:

133. After the conclusion of the testimony, the court received a letter dated February 10, 1965, from Commissioner Byron D. Woodside in which he stated in behalf of the Commission:

" * * * Not only the amounts recommended but also the reasons set forth by Mr. Bandler at the October 23, 1964 hearing, expressed our views. * * *

" * * * While these recommendations are often followed by district courts, the ultimate discretion in each case in fixing fees is, of course, the province of the Judge.

"As in other matters upon which it acts, the Commission here acted with the assistance of its professionally trained staff. An examination of the Commission or of individual Commissioners would result in nothing more than a restatement of the bases for the recommendations already stated by Mr. Bandler and briefly reiterated above. We believe that to attempt to probe further into the mental processes of the Commissioners and the extent to which we may have relied upon staff assistance in reaching our judgment, as the trustee and his counsel apparently desire, would be wholly inappropriate."

## MEMORANDUM OF DECISION.

██ In Finn v. Childs Co., 181 F.2d 431, 436 (2d Cir. 1950) the Court of Appeals stated:

"In the process of fixing allowances it has been generally found desirable, first to determine the total amount which the estate can afford to bear and which it should justly pay for the benefit rendered to it, and thereafter to allocate this amount among the various claimants according to the value of the services which they performed. In this way the burden which fees place upon the estate can be kept within reasonable limits * * *."

Such total is determined in respect of this case to be about $302,090, or at the rate of about $1 per share. It is 13.9% of the estate as at September 30, 1965. It yields all shareholders about $6.147 per share.

The holders of more than 19% of the shares, who paid $5 or less per share, make a profit of 22% or more. The holders of the rest, who paid an average of between $6.125 to $6.50 per share, will have no loss or a relatively small one, depending upon the price paid. Clearly inapplicable here are such over-all gauges of compensation as are applied to cases of "salvage from the wreck."

The Commission recommended an over-all figure of about $190,000. It is very slightly more than 9% of the estate as at September 30, 1965. The court disagrees with it as too low. The estate can and should bear substantially more, without adversely affecting considerations of economy and of public service by officers of the court. Reasonableness and fairness of compensation to the principal applicants require, upon the facts and circumstances of this case, that the recommendation be exceeded to the extent of the difference between the over-all figure determined by the court and that proposed by the Commission.

The attorney for the Commission intimated recognition that its over-all recommendation of very slightly more than 9% would not compensate for services rendered by the trustee and his attorneys after the July and August 1964 dates of their petitions. He noted that they had reserved the right to request compensation for all subsequent services. The over-all amount determined by the court comprehends provision for all services rendered and to be rendered by them from inception to termination of the proceedings. It also includes provision for allocated expenses allowed in respect of the office, stenographer and other facilities required by the Fund and for all disbursements for postage, telephone, travel and other items of such a nature that are not compensation but rather ordinary expenses of conducting business over a period of years.

The trustee requested compensation of $190,000 for his services from May 10, 1961 to July 10, 1964. The Commission recommended that he be allowed $100,000 for his services to July 10, 1964. In connection therewith views were expressed that the operations of the trustee did not involve the active conduct of business, but were a kind of "non-business" and that the estate at the beginning as well as at the end was about $2,100,000. These views were taken up and urged by

counsel for two holders of 40,000 shares. They had bought their shares at $5 per share when the Fund was organized and before the public offerings. Their holdings were slightly more than 13% of all the shares outstanding.

The attorney for the Commission later disclaimed any such "capsule description" of values, and admitted that while the trustee "may have been in his words operating three businesses one has to recognize as well, for example, that this one fund was not an operating fund, but rather in a state of liquidation." The counsel who had adopted and urged the views first expressed did not withdraw or modify them.

The answers to all the views, that are gathered together and epitomized in the recommendation of $100,000, are the specific facts found by the court. Generalizing the facts, the following should suffice for present purposes of decision. The trustee rendered his services as the sole executive head of three businesses, each without a controlling board of directors, and, in each case, with no more assistance than was proper and required in the circumstances. They were the services of such an executive. He rendered them for the periods required by the affairs of each business. He handed over the real estate business of OBCA and the radio station business of KITE to their purchasers as going concerns. He conducted what came into his hands as the mutual fund business of the Debtor as long as was necessary to rehabilitate the Debtor to a condition in which the insistent demands of the shareholders for redemption of their shares could be satisfied. They have been and, giving effect to this decision, will be satisfied to an extent that could not have been reasonably anticipated. This has been done in large part out of the increase in value realized or created in administration. The principal producing cause of the accomplishment was the trustee. To those who may profit more or lose less, depending upon the amounts allowed for expenses of administration, the judgment of the court assures as large a profit or as small a loss as the facts and circumstances found and the law reasonably and fairly permit.

■ The allowance requested by the trustee is granted to the following extent: His compensation is fixed and allowed at $135,000 for all services rendered from May 10, 1961 to July 10, 1964, and at $15,000 for all services rendered and to be rendered from July 11, 1964 to the end of these proceedings, or a total of $150,000.

■ Our prior decision reserved determination of the question whether sharing the cost of an office and secretary, instead of requiring the Fund to supply the trustee with a separate office and secretary wholly at its own cost, makes the Fund's allocated share of the cost nonreimbursable to the trustee. If the allocated cost is disallowed the Fund has a windfall of $19,655.96.

The Fund had to have these services. Their cost is a direct, primary expense of administration. Cf. Finn v. Childs Co., supra, 181 F.2d 437. Closely in point is In re Marine Maintenance Corporation, 181 F.2d 119, (3d Cir. 1950) cert. denied, Marine Maintenance Corp. v. McGlynn, 340 U.S. 820, 71 S.Ct. 51, 95 L.Ed. 602. There the rent was paid for an unused room in the trustee's suite of law offices, directly by the trustee to the landlord's agent. One of the stenographers from his law office was also employed to serve him in his capacity as trustee. It was held (181 F.2d pp. 122–123):

"Nevertheless, because the room had been in his law office suite it would have been far more advisable to have first presented the matter to the Court. Aside from this, there is not the slightest intimation of failure of duty or of negligence. There is no thought of bad faith and nothing to suggest that the trust estate was the loser in the transaction or that the Trustee dealt with it ' * * * in such a way as to make a personal profit

for himself.' Magruder v. Drury, 235 U.S. 106, 120, 35 S.Ct. 77, 82, 59 L.Ed. 151. The room was convenient and obtainable. Its closeness to Trustee's law office was an advantage to the trust estate. Under all the facts we do not think the surcharge is justified."

For similar reasons, exceptions to the cost of the stenographer were dismissed.

The sharing of offices and secretarial help was a practical and economical business arrangement for this estate. An order approving it prospectively could have been had upon request. Such approval may be given retrospectively, and is hereby granted. The court granted retrospective approval of the settlement with GAI to the extent to which the trustee had already consummated it without the court's approval.

The "compensation allowed to receivers and trustees * * * shall not include expenses necessarily incurred * * *." General Order 35. Under §§ 241 and 62, sub. a of the Bankruptcy Act, the court has power to award disbursement of expenses necessarily incurred, as well as compensation for services. The trustee is allowed reimbursement of the allocated cost of office rent and secretarial help to the Fund in the sum of $19,665.96 for the period May 10, 1961 to December 31, 1964. Reimbursement of the balance of his miscellaneous disbursements is also allowed in the sum of $28.63.

■ The attorneys for the trustee requested compensation of $125,000 for their services to August 6, 1964. They filed a supplemental affidavit concerning services rendered after that date to January 11, 1965, and requested reimbursement of a balance of miscellaneous disbursements. The Commission recommended that they be allowed $75,000 for their services to August 6, 1964. Taking into consideration all the factors to be weighed in fixing attorneys' allowances and the facts found, it is the judgment of the court that the recommendation is too small to the extent now indicated. The compensation of the firm of Kaye, Scholer, Fierman, Hays & Handler is fixed and allowed in the total sum of $90,000 for all services rendered to August 6, 1964, and for all services rendered and to be rendered since then and until the termination of these proceedings. Reimbursement is also allowed the firm of the balance of their disbursements in the sum of $259.90.

■ Francis N. Littlejohn, Jr., requested contingent compensation of $25,-000, inclusive of $4,897 expended merely for living quarters while away from his permanent home in New York City in the employment in San Antonio terminable at any time by the trustee. The Commission recommended $10,000. The controlling factor of the recommendation was that Mr. Littlejohn's contingent compensation should be limited to such a sum as, when added to what had already been paid, would be equivalent to his last earned salary of $21,000 per annum when he was employed in New York City on a permanent basis with fringe benefits.

Mr. Littlejohn's contingent compensation was not limited in intention by such prior fixed salary. Upon the facts found in relation to him, the contingent compensation of Mr. Littlejohn is fixed and allowed in the total sum of $25,000, inclusive of all his costs of living in San Antonio.

The remaining requests for compensation not heretofore wholly adjudicated are relatively small. They are fixed and allowed in the total amounts recommended by the Commission, as follows: Sherman & Goldring, attorneys for the Debtor, $3,500; Lewis, Roca, Scoville, Beauchamp & Linton, attorneys for the trustee in the Arizona action, $2,500; Cassel & Benjamin, attorneys for the trustee in the Florida action, $1,000.

These proceedings were without committees or committees' attorneys. Nevertheless, it was urged that there was duplication of work and of compensa-

tion requested therefor. The arguments to that effect cover three areas of activity in relations between the trustee and Mr. Littlejohn, the trustee and his attorneys, and the latter with attorneys in other jurisdictions.

As between the trustee and Mr. Littlejohn there was no such duplication. Mr. Littlejohn was the trustee's employee, without power to act or spend on any significant matter. He testified that "All the business affairs were controlled in New York."

As between the trustee and his attorneys, where they both rendered services on a particular matter, there was collaboration rather than duplication. In those instances in which it occurred, it was necessary or desirable. The contributive worth of the trustee and Mr. Kunen to such a legal drama as the $444,000 settlement with Mr. Rockwell without suit, is not non-compensable duplication of services. Cf. In re North American Light & Power Co., 101 F. Supp. 931, 936 (D.Del.1951), aff'd on rehearing, 106 F.Supp. 686, aff'd, 202 F.2d 638 (3d Cir. 1953), cert. denied, Securities and Exchange Commission v. Masterson, 346 U.S. 818, 74 S.Ct. 30, 98 L. Ed. 345; In re Engineers Public Service Co., 116 F.Supp. 930, 942–943 (D. Del.1953), aff'd 221 F.2d 708 (3d Cir. 1955). The rationale and justification of the settlement was a proper subject of the trustee's own petition. The responsibility was his to present to the court the true nature of the settlement as not being a simple reversal of the $444,000 investment in OBCA, and the reasons why a solvent prospective defendant upon claims then thought to aggregate $1,-500,000 should be released. The motion for summary judgment in the action against GAI for complete rescission, without ability to make complete restitution of the GAI stock, was a bold maneuver. It was proper for the trustee to urge that it be made, and to work on his own affidavit in support of it. It precipitated the settlement with GAI. The court does not share the notion that a trustee is an honorable functionary whose services, including his thinking, writing and decisions, should be by proxy of his attorney. The court has not compensated either the trustee or his attorneys for any service except to the evaluated extent of their respective contributions to a tangible result or to the performance of something that had to be done. There is no merit in the contention of duplication of services or compensation between the attorneys in New York City and those who acted as local attorneys in other jurisdictions.

The trustee is directed forthwith to accrue upon the books of account of the Debtor the amounts of all compensation and reimbursement fixed and allowed herein, less the amounts of all payments on account heretofore made pursuant to the order of October 29, 1964, and without duplication of any such payment. He is further directed to pay such accruals as promptly as possible before the end of the current fiscal year of the Fund, except such parts as are hereby reserved from payment.

Terminal administration of the estate should be assured of proper attention and dispatch. Accordingly, there is reserved from payment, subject to and until further order of the court, $15,000 of the compensation allowed and so accrued to the trustee, and $7,500 of the compensation allowed and so accrued to his attorneys.

To Leslie Kirsch more than any one else is due the unusual success of these proceedings. It was his intelligence, his skill, his steadfast loyalty to his oath of office and his plain hard work that produced this unparalleled result. He has earned the thanks of the shareholders and the commendation of the court. It is hoped that the lessons to be learned from the history of Townsend Growth Fund, Inc. will make these the last, as they were the first, proceedings under Chapter X of the Bankruptcy Act for reorganization of a mutual fund.

This is an order. No settlement is necessary.