**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**S & P NATIONAL CORPORATION et al., Defendants.**

No. 66 Civ. 512.

United States District Court
S. D. New York.
March 30, 1967.

See also D.C., 265 F.Supp. 993.

Walter P. North, Meyer Eisenberg, Washington, D. C., Richard V. Bandler, Marvin E. Jacob, New York City, for Securities & Exchange Commission.

Leslie Kirsch, New York City, trustee.

Cleary, Gottlieb, Steen & Hamilton, New York City, for trustee; Edmund H. Kerr, Lillian E. Kraemer, New York City, of counsel.

Shea, Gallop, Climenko & Gould, New York City, for corporate defendants; Martin I. Shelton, Milton S. Gould, New York City, of counsel.

## OPINION

THOMAS F. MURPHY, District Judge.

### THE INTERIM ACCRUALS.

This aspect of the case presents questions concerning approval of *accruals* of interim compensation for services to the estate. The amounts involved are substantial.

November 30, 1966, was the end of the corporate defendants' fiscal or tax year. The trustee, with the knowledge of the Court, made accruals, without payment, of compensation for services rendered by the attorneys for the corporate defendants, by the attorneys for the trustee, and by the trustee himself. After notice to all the parties, and to stockholders and creditors, the matter was heard upon the petitions, exhibits and testimony, including cross-examination of each of the petitioners.

The trustee made the accruals for the services of his attorneys and himself in good faith and for the tax advantage of the estate. Thereafter he similarly made an accrual of compensation for the services of the attorneys for the corporate defendants, when they requested leave of the Court, which was granted, to enlarge the trustee's plan of minimization of taxes to include an accrual for them also. As will more fully appear elsewhere, much tax planning occurred in the last few days of operation before the expiration of the tax year, and it could not have been otherwise.

The case started in receivership of the corporate defendants with consolidated cash of $10,479 on April 18, 1966. On November 30, 1966, their consolidated cash position was $2,756,159. On April 18, 1966, their consolidated asset position, after liabilities, was $770,656. On November 30, 1966, it was $2,105,604. Between those dates, the trustee made a profit of $2,029,934 (or $1,969,995.)

The latter calculation excludes a reserve for valuation included in the former. But for this pleasing plenty and its not so pleasing tax consequences, the accruals would not have been made, and the thankless and delicate task of confirming them retrospectively would not have been imposed upon the Court.

The contending parties are either adversaries in the main litigation or adversaries on the amounts in which the accruals should be confirmed. They all nevertheless agree that, in the unusual circumstances of this case, some part of the accruals should be confirmed because they would substantially lessen the corporate defendants' United States, New York State and New York City taxes for the fiscal year ended November 30, 1966.

In respect of the United States income tax alone, 48¢ on every dollar not accrued for these expenses goes to the tax. The estimated tax saving which may result is approximately $15,000 upon the accrual for the attorneys for the corporate defendants, and about $80,000 upon those for the trustee and his attorneys. This is not to imply that fees shall be accrued as expenses merely to save taxes.

The three accruals made for fees are: Shea, Gallop, Climenko & Gould, as attorneys for the corporate defendants, $35,000; Cleary, Gottlieb, Steen & Hamilton, as attorneys for the trustee, $50,000; Leslie Kirsch, as trustee and receiver (the "trustee"), $100,000.

## THE LITIGATION TO MAY 10, 1966.

The Securities and Exchange Commission (the "Commission") is in this case arrayed as plaintiff against the three corporate defendants ("S & P," "Smith-Palmer," and "Southwest") and against the two individual defendants ("Milton" and "Still"). Milton is represented by Paul, Weiss, Rifkind, Wharton & Garrison, who have not requested an accrual of compensation for their services to him. Still is represented by Shea, Gallop, Climenko & Gould, who have excluded their services to him from their applica-tion in its relation to the corporate defendants.

The history of the main litigation, to the extent that its complexities were initially revealed from its inception on February 21, 1966, to the determination of the first appeal on May 10, 1966, has already been written.

Our opinion dated April 16, 1966, 265 F.Supp. 993; opinion of the Court of Appeals, (2d Cir.) 360 F.2d 741, dated May 10, 1966. It was decided that the Commission had made out a *prima facie* case and that the orders of the District Court should be affirmed with a modification as to tax considerations. The order affirmed were dated April 16, 1966, as amended April 20, 1966, and April 21, 1966.

The amended order of April 16, 1966, prohibited the corporate defendants, pending the final hearing and determination of the action, from directly or indirectly selling or acquiring, by use of the mails or an instrumentality of interstate commerce, any security or any interest therein; from engaging in business in interstate commerce; and from disposing of any of their assets. It further prohibited them from filing with the Securities and Exchange Commission any report which is insufficient, false, or misleading in failing to disclose the identities of all parents, controlling persons, and directors of S & P, or which discloses them in such a manner as to be insufficient, false, or misleading. It further prohibited all persons from doing any act interfering or tending to interfere with the jurisdiction of the Court or with the trustee.

The order also appointed Leslie Kirsch as trustee and receiver of the books, records, and assets of the corporate defendants, pending the final hearing and determination of the action, to preserve their assets and to render effective the relief requested. It directed and empowered him: (i) to take possession and maintain the books, records, and assets of the corporate defendants; (ii) to ascertain the true state of their affairs and report thereon to the court and to the

shareholders of S & P; (iii) to determine what persons are and have been directors and parents and controlling persons of S & P; and (iv) to cause the defendants to comply with the applicable provisions of the Investment Company Act of 1940 and the Securities Exchange Act of 1934 (the "1940 Act" and the "1934 Act").

Included among the assets which the corporate defendants were thus prohibited from selling was a block of 479,730 shares of common stock of Great American Industries, Inc. ("GAI"). Nevertheless, upon the sale of this stock within the shortest possible time turned the fortunes of the corporate defendants. It was made the subject of the order of April 21, 1966, which will be discussed in connection with the services of the trustee.

### THE PARTIES' POSITIONS ON THE ACCRUALS.

Although everyone was in agreement that there should be accruals, the amounts were disputed. Marvin E. Jacob, as attorney for the Commission, submitted in its name a *memorandum* in which it was recommended that the accrual for the attorneys for the corporate defendants should be eliminated, and that the accruals for the trustee's attorneys and the trustee should be reduced to $30,000 and $50,000 respectively.

The attorneys for the corporate defendants presented recommendations in the name of George Zolotar, their recently elected president and director, that the trustee's attorneys accrual should be $30,000, and that the trustee's should not exceed an amount at the rate of $75,000 per annum.

Mr. Zolotar had been a member of the Commission's New York staff. He had participated in the Commission's recommendations on allowances in reorganization cases in years past. Mr. Zolotar's recommendation on the accrual for his counsel, the attorneys for the corporate defendants, was *sub silentio,* that it be confirmed.

### THE COMMISSION'S RIGHT TO BE HEARD.

The attorney for the corporate defendants who submitted Mr. Zolotar's recommendations, questioned whether the Commission's recommendations were the Commission's or its staff's. The memorandum of recommendations states that it is "submitted by the Securities and Exchange Commission as a party to this proceeding." The Court directs that it be deemed marked as an exhibit in evidence.

The Commission, as the party plaintiff herein, has the right to submit such recommendations and to be heard thereon. Concededly, their right is not based upon any such statutory and decisional authority as existed in Chapter X or Public Utility Holding Company Act proceedings.

However, the right of a party or an unrestricted intervenor to be heard on all litigated matters was well established in former equity receivership practice. The conventional equity receivership action was superseded by § 77–b and then by Chapter X, and other provisions for reorganization under the Bankruptcy Act. In recent years the Commission has found it necessary in the administration of its powers under the federal securities acts, to resort to actions which are in part receiverships in equity. This is such an action. If there were any doubt in law as to the Commission's right to present its recommendations in this case, the court would nevertheless receive them in the exercise of judicial discretion.

However, it must be noted that an arcanum surrounds recommendations on allowances submitted in the name of the Commission. It is extraordinary for a "party" to have in a court of equity immunity from confrontation and from cross-examination on an important litigated aspect of the action. Such difficulties exist in this case. They have been noted in others. In Re Liberty Baking Corporation, 189 F.Supp. 27, 30–31 (S.D.N.Y.1960). In Re Townsend

Growth Fund, Inc., 245 F.Supp. 484, 500–501 (S.D.N.Y.1965).

The record here fails to identify the individual on the Commission's New York or Washington staff who was principally responsible for the recommendations submitted in its name. The Commission makes a distinction between its actions *qua* Commission and the actions of its staff. For example, its memorandum states: "He [the trustee] obtained a 'no-action' letter from the staff of the Commission * * *." The "no-action" letter will be discussed further in its connection with the trustee's services.

The experience and quality of judgment of the attorney for the Commission, as the individual with the most or the most immediate contacts with the case and as the one who litigates it locally for the Commission, may be reflected in the recommendations submitted by him in its name. Therefrom may arise, in the mind of the court and in the minds of the parties bearing the brunt of the recommendations, questions such as those that arose in *Liberty, Townsend,* and herein. The court has, nevertheless, set aside all these questions and has considered on their merits the recommendations submitted in the name of the Commission.

## THE ATTORNEYS FOR THE CORPORATE DEFENDANTS.

Shea, Gallop, Climenko & Gould are not court-appointed officials, either in their capacity as attorneys for the corporate defendants or as attorneys for the individual defendant Still. The benefit to the estate which may result from their services cannot be evaluated at this stage of the case.

The record shows that the firm received from Still $20,000 in $10,000 installments, with a written agreement accompanying the second installment, to the effect that the whole fund would stand merely as security for payment of the firm's fees due from the corporate defendants. The letter was not placed in evidence. The trustee has claims against Still, and Still has claims against the corporate defendants being administered by the trustee. These claims have not been determined.

The record supports an inference that the firm has reduced the $20,000 fund to its possession as payment of its fees for the services it has rendered. After extensive cross-examination of two members of the firm by the Commission's attorney, the trustee's attorney conducted a brief cross-examination. The latter elicited testimony from a member of the firm that the $20,000 was no longer in its possession; that the firm had "gotten the money"; that the firm was "not holding it in our special account, if that's the purport of your question"; and that the firm's petition was for all fees which it would be entitled to from any source for services rendered to the corporate defendants.

The Commission's complaint alleges that Still acted in behalf of the "control" of S & P for years in violation of provisions of the 1940 Act and of the 1934 Act. The new officers and new directors claimed to have been elected on April 12, 1966, and headed as chief executive officer by Mr. Zolotar, the former member of the Commission's New York staff mentioned above, include Still as vice president and as a director. They were all elected by the former "control." The trustee has not yet determined who were the persons in such control. The attorneys for the corporate defendants have informed the trustee that they do not know who controlled the corporate defendants.

Under the circumstances, the court in the exercise of judicial discretion declines to confirm accrual against the estate of compensation for services rendered by this firm as attorneys for the corporate defendants, without prejudice to such application as they may deem proper to make therefor at the conclusion of the case. They may assist to accelerate that time. Cf. Securities and Exchange Commission v. S & P National Corp., (2d Cir.) 360 F.2d 741, 753, last sentence.

## THE TRUSTEE'S ATTORNEYS.

The firm of Cleary, Gottlieb, Steen & Hamilton was retained by the trustee with the approval of the court. When the trustee informed the court of his proposal to retain them, he stated that it was based upon the firm's distinguished reputation and his favorable opinion of Edmund H. Kerr, a member of the firm. He further stated that he had formed his opinion as a result of adversary professional relationships between them in proceedings affecting Townsend Growth Fund, Inc. in this jurisdiction and Townsend Corporation of America in the jurisdiction of the District Court of New Jersey. From the court's observation of the quality and effectiveness of Mr. Kerr's services in this case, the compliment is merited.

Only the amount of the accrual for the services performed by the firm is in question. The statements in the firm's petition as to the facts of their services are unquestioned. They are accepted by the court as established.

The Commission's recommendation to reduce the accrual from $50,000 to $30,000 was largely based on what was regarded as a fair rate per hour of time spent by partners and non-partner associates, with particular emphasis upon the proportion of the time spent by the latter. It points out that the trustee's accrual for the firm, when divided by the total of recorded hours spent in rendering the services, is about $43 an hour. It recommends an amount that arithmetically yields about $25 an hour.

Mr. Kerr represented in open court that the rate so recommended would not be compensatory of the cost of the services to his firm. The Commission had not objected to a large allowance to his firm through him in proceedings under the 1940 Act concerning Townsend Corporation of America in the District Court of New Jersey before Judge William F. Smith who is now a judge of the Court of Appeals for the Third Circuit. The arithmetical calculation of the compensation allowed by Judge Smith was at the rate of $43 an hour. The Commission itself had in proceedings under the Public Utility Holding Company Act awarded compensation to the firm, acting through Mr. Kerr, at an average hourly rate of $100 on one application, $55 on another, and $53.75 on a third.

The trustees utilized fully the services of the firm and its apparatus. He recommended that the accrual be confirmed.

Giving due weight to all the factors material and relevant to a proper interim accrual of compensation for this firm's services in the circumstances of this case, the court confirms the accrual made therefor to the extent of $50,000, plus their stated disbursements.

## ANNUAL AND HOURLY RATES OF COMPENSATION.

The Commission's recommendations contain calculations casting various amounts into accruals of compensation at different annual and hourly rates. The court negates any implication that the amount of accrual confirmed for any one, in the extraordinary circumstances of this case to November 30, 1966, established his annual or hourly rate of compensation. Without limitation of present finality, there may be future adjustments upon applications hereafter made.

## THE TRUSTEE.
## THE GAI STOCK.

The Commission's memorandum of recommendations states: "On April 19, 1966, shortly after his appointment, the trustee-receiver determined to sell the block of GAI stock." This assertion does less than justice to the fact that the block had been for months and continued to be unsalable in any part until the trustee made it salable between the close of business on April 18, 1966, the first day of his functioning, and the opening of business on April 21, 1966.

The Commission's memorandum also states: "Between April 25 and November 29, 1966, the trustee-receiver effected 315 trades of GAI stock at prices ranging between $13⅜ and $3⅛ per share. As a result, the entire block of 479,730 shares of GAI stock was sold on the

open market at an average price of $6⅞ and a gain of $2,029,962 was realized by Southwest." That assertion is incorrect in the first of its crucial dates. The stock became salable, and the trustee began to sell it, on April 21, 1966. The assertion fails to reveal that the trustee was excluded from the market of April 22, 1966, and that the Commission suspended trading in GAI stock on April 28, 1966.

The Commission's assertion also fails to do justice to the following facts. The trustee had only four trading days in April 1966, and his sales during those few days constitute the first of two distinct and widely separated groupings of sales. The Commission repeatedly and continuously thereafter suspended trading in GAI stock for almost six months until October 24, 1966. The suspensions must have had some relation to the precipitous fall in the market price of GAI stock when the Commission permitted resumption of trading. They must have affected the market prices procured by the trustee in the second distinct grouping of sales of GAI stock between October 24th and November 29, 1966. These facts and others hereafter mentioned should be considered in evaluating the trustee's sales of the stock.

The block of 479,730 shares of GAI stock was carried on the books of the prior management or "control" at $959,-460 giving effect to a valuation reserve of $59,966. Its cost per books was $2⅛ per share. Since 1957, GAI stock had not paid a dividend. In January 1966, it sold at $1½ on the American Stock Exchange. In February 1966, it rose to $14⅝. Its earnings and dividend rating was "lowest." The Commission contended that GAI's officers had made materially false statements concerning certain mineral properties acquired or in prospect of acquisition, and that the misstatements appeared in GAI's reports to the Commission filed February 15th, April 13th and May 10, 1966. Securities and Exchange Commission v. Great American Industries, Inc., et al., U.S. D.C., S.D.N.Y., 259 F.Supp. 99, now under appeal by the Commission.

The smaller the cost of a stock the larger is the percentage of its price fluctuation up or down. In February and March 1966, the prior management or control sought to cause the stock to be sold at or about its abnormal high. It could not. The Commission opposed. Not a share of it was sold during the period of its high levels from February 21st through April 20, 1966. The Commission's statement that the trustee "determined" to sell on April 19, 1966, rings hollow. No competent fiduciary would have to spend a minute to come to such a determination concerning a stock of such dubious intrinsic value, with the cost of $2⅛ per share and willing buyers in volume at more than $11 per share. Common sense dictated sale, as much and as speedily as possible. As the Court of Appeals said of this stock, "it is obviously in the best interests of all concerned that the high market price be obtained before it may disappear." Securities and Exchange Commission v. S & P National Corporation et al., (2d Cir.) 360 F.2d 741, 751.

On April 19, 1966, while the market in GAI stock was churning in large volume between $11 and $12 per share and while the trustee was unable to sell a single share of the 479,730 share block of which he had procured possession after the close of the market on April 18th, he perfected a plan to render it salable. No party to the action, neither the plaintiff Commission nor the corporate defendants nor the latter's attorneys, helped formulate the plan. With the utmost celerity and by a series of coordinated maneuvers it was effected. He procured the "no action" letter from the Commission's staff. He procured the order of the court, dated April 21, 1966, mentioned above. It authorized sale in the trustee's discretion. He prepared the order. For a month he acted not only as the business executive, but also as the attorney at law. The stock was thus made salable by the acquiescence embodied in the "no

"action" letter and by the authority of the court. In the morning of April 21, 1966, the trustee began to sell. That day he sold 25,000 shares between a high of $13⅜ and a low of $12¾.

The block was in the form of a single certificate. Practical trading required that it be divided into many small lots. On April 21–22, 1966, GAI refused to transfer. The trustee was thus excluded from the market of April 22, 1966. But by the close of that day, still acting as the business executive and the attorney, he succeeded in eliminating the refusal to transfer. He resumed trading again on Monday, April 25, 1966, and continued to trade through April 27, 1966. On April 28, 1966, the Commission suspended trading.

During the four trading days available to him in April 1966, the trustee sold 185,300 shares of GAI stock in 77 trades for $1,896,475, between a high of $13⅜ and a low of $9⅛. This was the first grouping of the sales.

Almost six months later, during 26 trading days on and after October 24, 1966, when the Commission permitted resumption of trading, the trustee sold 294,430 shares of GAI stock on 238 trades for $1,164,996, between a low of $3⅛ and a high of $6⅛. This was the second grouping of the sales. It was coordinated to the end of the tax year on November 30, 1966.

The following tabulation shows the realities of the trustee's dispositions of the block of 479,730 shares.

| Dates | Shares Sold | Net Proceeds | Net Profits Excluding Valuation Reserve |
|---|---|---|---|
| 4/21, 25–27/66 | 185,300 | $1,860,015 | $1,466,252 |
| 10/24–11/29/66 | 294,430 | 1,129,407 | 503,743 |
| Total | 479,730 | $2,989,422 | $1,969,995 |

## RESPONSIBILITY AND RESULTS.

On April 19, 1966, before the stock had been rendered salable, officials of the American Stock Exchange expressed concern to the trustee if the block "should hit the market," and wished to know his trading intentions. The trustee's responsibility in trading 185,300 shares in four days was heavy. A mistake on his part in the timing and size of his trades could have broken the market. He succeeded in avoiding that danger and in disposing of 38% of the block without detriment to the public investors in GAI stock as well as to the large profit of the estate. The trustee's responsibility was even greater on and after October 24, 1966, when trading resumed. No one knew at what price the stock would reopen. There was an accumulated short position of more than 172,000 shares. There were traded that day 521,500 shares of GAI stock between a long delayed reopening with 143,000 shares at a high of $3¾ and a low of $2¾. This was off at the high 6⅜ points from the last trade of April 27, 1966. The trustee did not contribute to that decline. He refrained from participating in the reopening. He conservatively let out the remainder of the shares over 26 days, "averaging" largely on the up-tick, from a low of $3⅛ to a high of $6⅛.

The court finds that the reasonable value of the trustee's services concerning the GAI stock, especially those by which it was rendered salable and sold, is not fairly measured by the time within which they were performed. Here was a race against time. The quicker the better. In the same category are the trustee's services that resulted in elimination of GAI's refusal to transfer, which excluded him from the market of April 22, 1966. Continuation of the refusal for any one or more of the three

days available for trading between April 25th and April 27, 1966, would have deprived the estate of most if not all of the large profit made on the sales of those days at high market prices for GAI stock never seen again.

The brokerage commission alone on the sale of the 479,730 shares of stock on the American Stock Exchange exceeds $60,000. The broker did no more than execute the orders given by the trustee in his 315 trades for almost $3,000,000. If the arm earned $60,000 for doing this, can the brain that first made it possible and then directed precisely how and when it shall be done, be worth only $50,000 for this and much more besides?

The trustee testified on cross-examination that the creative thoughts upon which these services as to the GAI stock were based were intuitive flashes. Behind them was 37 years of experience. The court should not adopt a mere "time clock approach" in evaluating them. Cf. In Re Snell's Estate, 17 A.D.2d 490, 494–495, 235 N.Y.S.2d 855, 860. Especially so here, where the beneficiaries of the services may for the most part be the very parties charged by the Commission to have committed the violations of the 1940 Act and the 1934 Act which are the subject matter of these proceedings. It appears from the trustee's first report that the public stockholders of S & P are a relatively small minority. The court holds that the fair and reasonable value of the trustee's services in respect of the GAI stock are alone worth more than the Commission has recommended in respect of the totality of his services.

## TAXES.

Another major area of the trustee's services was taxes and tax planning. The Commission's recommendation states, in discussing the first appeal to the Court of Appeals, that the court "affirmed the order appealed from with a modification not now material." The modification is material in evaluating the trustee's services. It related to tax considerations which the Court of Appeals described in detail and summarized as follows:

" * * * According to appellants [the corporate defendants], the one capital gains tax their proposal purports to eliminate may amount to as much as $1 million." (360 F.2d p. 751).

The trustee opposed that tax plan. His opposition was based on, among others, the grounds that dissolution of the corporate defendants as required by their tax plan, would have the effect of "sweeping under the rug" the corporate and statutory wrongs with which they were charged. The matter gave this court concern initially and when the tax plan as amended was again proposed after the first appeal had been determined, this court again denied approval. In doing so, weight was given to the trustee's points that the corporate defendants' estimate of tax saving was exaggerated; that other proper and practical plans to save taxes were being considered by him; and that the corporate defendants' amended plan also had ulterior motives. The corporate defendants appealed to the Court of Appeals from the order denying approval. It was affirmed. The trustee, when acting alone on the first appeal and again on the second appeal when represented by attorneys, participated briefly but significantly in the arguments before the Court of Appeals concerning the tax plans denied approval.

The trustee reviewed and participated in the preparation of 38 delinquent federal and state tax returns which he signed and filed. He directed and was the catalyst in the evolution and consummation of the tax plan that was finally adopted. This was done within a few days before the expiration of the tax year on November 30, 1966, within unavoidably close and pressing time limitations. Giving effect to all the trustee's tax planning the last estimate of the Federal, New York State, and New York City taxes payable as at November 30, 1966, depending upon the amounts of accruals for services, ranges from $51,000 to $76,000.

## OTHER CATEGORIES OF SERVICES.

The trustee took possession of the books, records, and assets of the defendant corporations and of their subsidiaries. His services in his respect were quite different from the usual situation of getting the keys to their offices, sitting himself in the executive chair, and continuing with an established staff of employees. There were none such. He had to overcome the resistance and obstacles detailed in his petition.

The trustee, over opposition of the corporate defendants, took control of Kraftville Corporation and Wellit Corporation, two subsidiaries not in trusteeship. The administration of the defendants in trusteeship would otherwise have been segmented into partial ineffectuality. Without his control of Wellit Corporation, the tax plan finally adopted could not have been consummated.

Despite the objections of the corporate defendants, the trustee registered them as investment companies under the 1940 Act. He worked closely with his accountants and studied and made suggestions concerning the form and contents of their extensive first report. He participated in the hearing of every matter presented to the court and acted as his own attorney in such of them as occurred before May 19, 1966. He made suggestions concerning and certified by his signature and oath, with personal responsibility therefor, almost all of the applications that have come before the court. He similarly participated in the preparation of other papers required in administration. Almost every document that has come into the court file of these proceedings reflects consideration, discussion, suggestion, or directive on his part. He received and acted upon 217 letters. He wrote 133 letters. He made 570 telephone calls. Many of them were conferences rather than calls. He wrote

51 important memoranda. A summary of them is in evidence. The practical control, direction, and responsibility for the administration of this estate has been his.

Through November 30, 1966, he spent in rendering all his services 139 recorded working days of at least eight hours each day, including part or all of nine Sundays. His thinking about the problems of the trusteeship was intense and pervasive beyond as well as within his working days.

The court agrees that thought is work; that time spent in work at his level of activity is largely worthless without it; and that it is not fair to evaluate his services in terms of time, rather than in terms of the responsibility and the results accomplished.

The court repeats in this case the judgment upon his experience and ability, which was made in another. In Re Townsend Growth Fund, Inc., 245 F.Supp. 484, 494, findings of fact 79–80.

Only the amount of the accrual for his services has been disputed. The statements of fact in his petition concerning his services are unquestioned. They are accepted by the court as established.

In view of the grave responsibility imposed upon the trustee and the very substantial success of his services in a race against time, and giving due weight to all the other factors material and relevant to evaluating them in the unique circumstances of this case, the court confirms the accrual made therefor to the extent of $100,000, plus the disbursements stated in his petition.

This is an order. No settlement is necessary. Let the trustee proceed accordingly.