**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**S & P NATIONAL CORPORATION, Smith-Palmer Corporation, Southwest International Corporation, David M. Milton and Ralph E. Still, Defendants.**

**No. 66 Civ. 512.**

United States District Court
S. D. New York.

Sept. 12, 1967.

Richard V. Bandler and Marvin E. Jacob, New York City, for S.E.C.

Leslie Kirsch, New York City, trustee.

Cleary, Gottlieb, Steen & Hamilton, New York City, Edmund H. Kerr, Alan Appelbaum and George Weisz, New York City, of counsel, for trustee.

Shea, Gallop, Climenko & Gould, New York City, Martin I. Shelton, New York City, of counsel, for corporate defendants.

Orans, Elsen & Polstein, New York City, Sheldon H. Elsen and Lewis Shapiro, New York City, of counsel, for principal creditors of S & P National Corp.

A. Logan Langwith, New York City, for Sterling Precision Corporation.

OPINION

THOMAS F. MURPHY, District Judge.

I

The case is now before the court upon an application for judicial approval of a Plan of Settlement and Reorganization ("the Plan"), and for an order that it be consummated. The Plan is intended to resolve the welter of issues between the plaintiff Securities and Exchange Commission ("the Commission"), the corporate defendants ("S & P", "Smith-Palmer" and "Southwest"), and the individual defendants ("Milton" and "Still"). It is also intended to effect a settlement of a projected lawsuit by the trustee in behalf of the corporate defendants and their subsidiaries against Milton, Still,

and others. After due notice by mail and publication, a hearing was held at which all persons having any interest were given an opportunity to present their views and evidence concerning the Plan.

The origin and nature of the case and the developments from its inception on February 21, 1966, to the end of the corporate defendants' fiscal year on November 30, 1966, are stated in Securities and Exchange Commission v. S & P National Corporation, et al., D.C., 265 F.Supp. 993, affirmed with a modification relating to a tax problem, id., 360 F.2d 741, 2d Cir., followed by a decision on other developments, id., 267 F.Supp. 562. The trustee's first report dated March 30, 1967, contains a survey of the case to a time proximate to that date. In the part most material to adjudication of the Plan, a summary follows of what went before.

S & P owns all the stock of Smith-Palmer, which owns all the stock of Southwest, which owns a majority of the stock of Kraftville Corporation ("Kraftville"). Southwest also owned all the stock of Wellit Corporation ("Wellit"), until the sale by the trustee of part of such stock and the liquidation and dissolution of Wellit.

The Commission's complaint alleged that the corporate defendants were investment companies which violated provisions of the Investment Company Act of 1940 ("the 1940 Act") by failing to register as such with the Commission; that the individual defendants Milton and Still controlled S & P, individually or as a member or representative of persons acting in common; that Milton had statutory relationships of parent, affiliate, director, or control of S & P, which were not disclosed in reports which S & P had filed with the Commission under requirements of the Securities Exchange Act of 1934 ("the 1934 Act"); that such non-disclosures made the reports materially insufficient, false and misleading; and that Milton and Still knowingly and wilfully caused or procured the acts of the corporate defendants, which constituted the violations of law. The Commission also alleged that contracts and transactions by the corporate defendants with persons controlled by or affiliated with them or with other persons, were void or voidable under provisions of the 1940 Act, and are subject to rescission or recovery of damages therefor. The Commission's complaint demanded preliminary and final injunctive relief to remedy the violations of law which it alleged, and the appointment of a trustee under the 1940 Act and of a receiver under the 1934 Act. The defendants' answers denied the material allegations of the Commission's complaint, alleged defenses, and demanded that the complaint be dismissed.

This court found that the Commission had established a *prima facie* case, granted its motion for preliminary injunctive relief, and appointed Leslie Kirsch as trustee and receiver ("the trustee") of the defendant corporations and of their books, records and assets. The Court of Appeals affirmed.

The trustee took possession and control of the corporate defendants and stock control of Kraftville and Wellit. He caused S & P, Smith-Palmer and Southwest to be registered with the Commission as investment companies under the 1940 Act. Between April 18, 1966, when the trustee began to function and November 30, 1966, a gain of $2,029,962 was realized upon sales of stock of Great American Industries, Inc. ("GAI"); consolidated net assets were increased from $770,656 to $2,094,019; and consolidated cash or its equivalent was increased from $10,479 to $2,891,739.

The trustee's first report dated March 30, 1967, described the corporate apparatus as follows:

"Above S & P is a complicated congeries of corporations and individuals, named and unnamed, purporting to culminate in a trust (the 'Upper Structure'). Excluding a bank's mortgage on Kraftville's property, components of the Upper Structure and two related companies held an estimated 90% or more of the creditor position against S & P and its subsidiaries which constitute the Lower Structure.

That large creditor position may now be held by Cross Islands Corporation, N. V., a Curacao corporation ('Cross Islands') * * *. It is suspected that a relationship exists between Cross Islands and the Upper Structure or the control of the Lower Structure, but the nature of such relationship is not now known.

"Components of the Upper Structure held 100% of the outstanding Series E Preferred Stock, 88.97% of the Class A Stock, and 78.71% of the Common Stock, of S & P. The charter documents provide that the Series E Preferred Stock is entitled to cumulative dividends of $2 per share per annum and to $50 per share on liquidation. They also provide that the Class A Stock is entitled to $20 per share on liquidation.

"As of a recent date, S & P had 431 holders of its Class A Stock and 552 holders of its Common Stock. Many or most of them are public investors."

The trustee's statement of consolidated net assets of $2,094,019 as at November 30, 1966, was after deduction of $877,833 of debt claims upon notes and accounts payable to companies which investigations might disclose were affiliates under the 1940 Act. The decision of the Court of Appeals noted the Commission's interest in transactions with affiliates in violation of Section 17, which might be void under Section 47, of the 1940 Act. It also noted the trustee's interest in equitable subordination of insiders' claims against the assets of S & P to the claims of public investors in S & P. Securities and Exchange Commission v. S & P National Corporation, et al., 360 F.2d 741, 752, and footnotes 15 and 21 (2d Cir.).

The trustee, his attorneys and accountants, made investigations. Discovery proceedings, by examinations under oath, were conducted. Shortly after the publication of the trustee's first report on March 30, 1967, and before the complaint in the trustee's projected lawsuit was presented to the court for leave to sue, settlement discussions were begun. The Plan ensued.

## II

The Plan is divisible into two parts. One is viewed in relation to the trustee's projected lawsuit, and the other in relation to the Commission's demand for permanent injunctive relief.

The Plan requires a release of Milton, Still, Utermohlen, Cross Islands, Palo Alto, S.A., Paul O. Buckley, Reswood Corporation, Price Manufacturing Corporation, Atlantic Industrial Corp., Coracon Corporation, Velton Corporation and Guaranteed Capital Corporation. All of them except Milton and Utermohlen signed the Plan as "subordinated parties," Utermohlen did so as a "consenting party," and Milton was bound to it by separate stipulation. The release will discharge all of them from all liability upon all claims which the trustee might have alleged against them in his projected lawsuit in behalf of S & P and the other members of the Lower Structure.

The financial provisions of the Plan constitute the consideration to be given for the release. They are based on the figures in the financial statement as at November 30, 1966, in the trustee's first report. This discussion proceeds on the same basis.

The Plan provides that S & P shall make an offer for a period of sixty days to purchase all shares of stock in S & P owned by public holders. The purchase price to be paid them is $4.18 per share for Common Stock, and $20.90 per share for Class A Stock. The charter of S & P makes Class A Stock convertible into Common Stock at the rate of one for five.

Without subordination, the stock claims against the $2,094,019 of consolidated net assets at November 30, 1966, would be $679,500 of charter liquidation preference and cumulative dividend claims upon 9,000 shares of Series E Preferred Stock outstanding, plus $1,413,692 of charter liquidation claims upon 94,815 shares of Class A Stock outstanding, and would total $2,093,192. Without subordi-

nation, the result would be $75.50 per share upon the Series E Preferred Stock and $14.91 per share upon the Class A Stock. There would be nothing left for the 660,279 shares of Common Stock outstanding.

The following table explains the subordination and its consequences:

## S & P NATIONAL CORPORATION AND CONSOLIDATED SUBSIDIARIES, DISTRIBUTION OF NET ASSETS AS AT NOVEMBER 30, 1966, WITH SUBORDINATION

| | | | |
|---|---|---|---|
| Net assets as at November 30, 1966 | | | $2,094,019 |
| Add: | Notes and accounts payable to companies which investigations may show are affiliates, and accrued interest thereon | | 877,833 |
| | Net assets available to public holders of Common and Class A Stock | | $2,971,852 |
| Less: | Purchase price payable to public holders of: | | |
| | Common Stock—140,584 shares at $4.18 per share | $587,641 | |
| | Class A Stock—10,450 shares at $20.90 per share | 218,405 | 806,046 |
| | Net assets available to debt subordinated and to insiders' stockholdings subordinated | | $2,165,806 |
| | Net assets available to debt subordinated and to insiders' stockholdings subordinated | | $2,165,806 |
| Less: | Notes and accounts payable to companies which investigations may show are affiliates, and accrued interest thereon | $877,833 | |
| | Series E Preferred Stock—9,000 shares: | | |
| | Liquidation preference, $50 per share | $450,000 | |
| | Cumulative dividends | 229,500 | |
| | | 679,500 | |
| | Class A Stock—84,365 shares at remaining liquidation value of $7.21 per share | 608,272 | 2,165,605 |
| | Balance not distributed due to rounding of per share amounts | | $ 201 |

### PER SHARE AMOUNTS TO INSIDERS' STOCKHOLDINGS SUBORDINATED

| | |
|---|---|
| Series E Preferred Stock | $75.50 |
| Class A Stock | 7.21 |
| Common Stock | .00 |

———◆———

Evaluation of the consideration for the release exhibits a striking contrast. The public holders of 140,584 shares of Common Stock who accept the purchase offer

will receive $4.18 per share, whereas the insiders who hold 519,695 shares of Common Stock will receive nothing therefor. The public holders of 10,450 shares of Class A Stock who accept the purchase offer will receive $20.90 per share, whereas the insiders who hold 84,365 shares of Class A Stock may receive $7.21 per share.

The consideration for the release may also be evaluated in the light of market quotations for the stock. According to quotations compiled by the National Quotation Bureau, during the years 1962 through 1965 the highest bid price for the Common Stock was 46¢ per share, and the highest asked price was 60¢ per share. During 1966 through May 15, 1967, the highest bid price was $1 per share and the highest asked price was $1.75 per share. During the years 1962 through 1965, the highest bid price for the Class A Stock was $6.00 per share, and the highest asked price was $8.00 per share. During the period 1966 through May 15, 1967, the highest bid price was $8.50 per share and the highest asked price was $10.50 per share.

Both the public holders and the insider holders of S & P stock are fortunate that the gain of $2,029,962 was realized during the trusteeship from sales of the GAI stock mentioned above. On the basis of the consolidated net assets of $770,656 available on April 18, 1966, when the trusteeship began, and ranking all debt claims and stock claims without subordination, the amounts available would have been: upon the Series E Preferred Stock, $74.50 per share; upon the Class A Stock, $1.05 per share; upon the Common Stock, nothing. With subordination, there would have been a deficit of $35,390 upon the debt claims subordinated, and there would have been nothing available for any one of the three classes of stock held by insiders.

The trustee's statement of consolidated net assets of $2,094,019 as at November 30, 1966, is after provision for expenses of administration to that date, but before provision for such expenses after

that date. The amount payable to public holders who accept the purchase offer is not to be reduced by reason of any future event. Consequently, all the expenses of administration after November 30, 1966, will be borne by the subordinated holders of Class A and Common Stock. Subject to certain conditions, the Plan provides that the trustee and his counsel shall not apply for aggregate allowances for services rendered after November 30, 1966, in excess of $75,000 for the trustee or in excess of $125,000 for his counsel.

The subordination is also for the benefit of public holders who may not accept the purchase offer. The Plan requires the dissolution of S & P, Smith-Palmer and Southwest. Upon the distribution of assets in the dissolution, winding up and liquidation of S & P, public holders who may not have accepted the purchase offer will first be entitled to receive $4.18 per share for their Common Stock and $20.90 per share for their Class A Stock before the subordinated parties are entitled to receive any payment upon any of their debt or stock claims. However, any depreciation of assets arising from any contingency affecting the financial position of S & P as at November 30, 1966, including taxes and tax claims, is to be borne by the subordinated parties and any public holder who may not accept the purchase offer. In view of the nature and extent of the subordination, adverse developments from any such contingency would have to be extreme to reduce the amount payable to public holders who do not accept the purchase offer.

The amount to be paid upon the stock of public holders who do not accept the purchase offer, like that of those who do, is not subject to increase above $4.18 per share of Common Stock or $20.90 per share of Class A Stock. Subject to the contingencies discussed in the trustee's financial statements as at November 30, 1966, and as at July 31, 1967, consolidated net assets as at that later and latest practical statement date, were $2,185,210. Subject such contingencies, there was an increase of $91,191 over

consolidated net assets as at November 30, 1966. Among such contingencies are taxes and tax claims. There is no calculus by which the contingencies can be computed to a certainty that there will be an ultimate increase in consolidated net assets over what they were as at November 30, 1966. The present increase subject to such contingencies as at July 31, 1967, is therefore not deemed material in relation to the public holders who are the beneficiaries of the subordination provided in the Plan, whether or not they accept the purchase offer.

### III

On August 30, 1967, the court entered two consent judgments against Milton. One was made in the action entitled Securities and Exchange Commission, plaintiff v. David M. Milton, defendant, The Equity Corporation and Bell Intercontinental Corporation, nominal defendants, USDC, SDNY, 66 Civ. 3053. The consent judgment made therein permanently enjoins Milton from acting as an officer, director, member of an advisory board, investment advisor, or depositor of any registered investment company. It also permanently enjoins Milton, while an affiliated person of any registered investment company, from engaging in transactions contravening provisions of Section 17(a) of the 1940 Act, or causing any affiliated person of any registered investment company to engage in any such transactions. It further permanently enjoins him from engaging in transactions contravening provisions of Section 10(b) of the 1934 Act or of Section 17(a) of the Securities Act of 1933.

The second consent judgment was entered against Milton in the instant action. It permanently enjoins Milton from filing any untruthful report or information with the Commission, and from causing the corporate defendants to omit to file any proper report or information required by the 1940 Act or the 1934 Act. It contains appropriate saving provisions of all other rights against Milton in the event that the Plan

were not approved and he were not discharged by the release discussed above.

The Plan provides for the termination of the instant action against the corporate defendants and the individual defendant Still by another consent judgment. This judgment permanently enjoins the corporate defendants and Still from all such acts or omissions as are the subject of the permanent injunction already entered against Milton in this action.

Each consent judgment or the stipulation upon which it is based states that Milton, Still, and the corporate defendants, although denying the charges of wrongdoing on the part of each of them alleged in the Commission's complaints, nevertheless severally consent to the entry of the judgment.

The consent judgment in this action also directs S & P, Smith-Palmer and Southwest, their officers, directors and attorneys, to present to the court for approval a "Plan of Complete Liquidation and Dissolution" ("the dissolution plan") of these corporations. Within a prescribed period after such approval, these corporations must liquidate and dissolve in accordance with the provisions of the dissolution plan.

The public holders who accept the purchase offer should receive their money within a short time after they accept the Plan and transmit their stock for purchase. Public holders who do not accept the purchase offer will be paid their money when they surrender their stock in the subsequent dissolution, winding up and liquidation of S & P. Acceptance of the purchase offer has the advantage of relative immediacy of payment and avoidance of contingencies.

The Plan requires Milton, Still, Utermohlen, Cross Islands and the eight others who are to be released, to file in this court verified statements, representations and warranties, with the contents prescribed in the Plan. The counterparts of these statements in the Plan reveal in detail the respective beneficial interests, if any, of each of these twelve parties within or in connection with the

Upper Structure and the Lower Structure of the corporate apparatus, as at April 18, 1966.

## IV

Representatives of the Commission, to whom or to which expertise in such matters is sometimes attributed, participated in the discussions which resulted in the Plan. The Commission, by its attorneys in this case, is a signatory to the Plan. The trustee testified concerning the fairness and feasibility of the Plan, and recommended that it be approved and ordered consummated by the court. He testified to various factors which he considered in formulating his recommendation. No one opposed.

Subordination by components of the Upper Structure and others in any relationship to the Upper Structure, of 100% of the debt claims aggregating $877,833 of all of them who could be deemed affiliates under the 1940 Act, is an optimum result. Subordination of their 9,000 shares or 100% of the issue of Preferred Stock, of their 84,365 shares or 88.97% of the issue of the Class A Stock, and of their 519,695 shares or 78.71% of the issue of Common Stock, to the rights of the minority public holders of the Class A Stock and Common Stock, is in the range of an optimum result.

There are factors which might bar a favorable result if the trustee's projected lawsuit were to be prosecuted. Some of the transactions in question occurred more than ten years ago. The defense of statute of limitations or laches would be an absolute bar to recovery upon such claims if either defense were held to be applicable and were sustained.

Do the provisions of the 1940 Act, in respect of the voidability of transactions between a registered investment company and its affiliates, apply to affiliates of such unregistered investment companies as the corporate defendants were until the trustee caused them to be registered after April 18, 1966? Cf. Upson v. Otis, 155 F.2d 606, 610 (2d Cir.). If *Upson* be not, as it may not be, determinative of the question, the Plan obviates the necessity of determining it in the trustee's projected lawsuit.

The net dollar effect of equitable adjustments which might have to be made, upon reversals of questioned transactions, is not susceptible of prediction. Most of the trustee's claims would be for accountings in equity, and not for a precise amount of money damage. The future solvency of prospective defendants to satisfy whatever judgment might be procured is also unpredictable. The cost of litigating the trustee's prospective lawsuit, which he testified might take two years before determination at first instance only, would be substantial.

Federal income tax returns after 1952, including the consolidated federal income tax return for the fiscal year 1966 in which the large gain on the GAI stock was realized, have not been audited by the Internal Revenue Service.

Upon all the evidence adduced at the hearing, we conclude that the financial provisions of the Plan are in the high range of fairness and feasibility to all concerned or affected thereby. We also find that the practical objectives of the Commission in this action have been attained by the consent judgments against Milton, Still, and the corporate defendants, and that further performance by the trustee of the second and third mandate in the order of his appointment has become moot. The Plan is therefore approved and confirmed.

Let the trustee, the plaintiff Commission, the corporate and individual defendants, the others signatory to the Plan, and all persons required to act pursuant to any of its provisions, proceed to consummate it. The court retains jurisdiction for all the purposes stated in the Plan.

This is an order. No settlement is necessary.